# STARR v. LONG JIM.

ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 151. Argued January 28, 1913.—Decided February 24, 1913.

An agreement as to division and allotment of lands between the Secretary of the Interior and chiefs representing Indians which is informal in terms and is afterwards ratified by Congress should be construed so as to confer upon the Indians the full measure of benefit intended.

The best interests of the Indians do not always require that they should be allotted lands in fee rather than by having them held in trust by the Government for them.

The agreement with Chief Moses and others of July 7, 1883, as to distribution of lands in the Columbia and Colville reservations and the act of July 4, 1884, 23 Stat. 79, validating it, and the subsequent acts relating thereto, were properly construed by the Secretary of the Interior to the effect that the Government held the land in trust for the Indian allottees for a period of ten years and without power of alienation meanwhile except by consent of the Secretary.

The general rule, that a conveyance with warranty estops the grantor when he afterwards becomes the owner to deny the grantee's title, does not apply to a conveyance made by one *non sui juris* or that is contrary to public policy or statutory construction.

An allottee Indian, who conveys by warranty deed before patent and during the period of suspension of alienation without the consent of the Secretary, acts contrary to the policy of the law and is not estopped to deny the validity of the deed after patent, and the grantee acquires no rights.

59 Washington, 190, affirmed.

THE facts, which involve the title of Indians to lands within the Columbia Indian Reservation and the construction of an agreement allotting lands between Chief Moses and others, are stated in the opinion.

*Mr. R. W. Starr pro se* and *Mr. Frank Reeves* for plaintiff in error.

*Mr. A. G. Avery,* with whom *Mr. F. T. Post* was on the brief, for defendants in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

The plaintiff in error brought this action against the defendants in error in the Superior Court of the State of Washington in and for the County of Chelan to establish and quiet his title to certain lands in that county. The answer showed that the plaintiff claimed his title under a deed made by the defendants, and attacked the validity of this instrument on the ground of fraud in its procurement, and on the further ground that at the time of its execution

the title to the lands therein described was in the United States, and the defendants were without power to convey them. The trial court made findings of fact negativing the charges of fraud, and concluded as matter of law that the conveyance made by the defendants to plaintiff was valid, and that the plaintiff was entitled to recover. From the resulting judgment the defendants appealed to the Supreme Court of the State, which reversed the judgment and remanded the cause, with directions to enter a judgment in favor of the defendants upon terms that they should repay the consideration paid by the plaintiff to them, with certain additional charges. 52 Washington, 138. After the cause was remanded, a further hearing was had and a second and final judgment entered in accordance with the mandate. From this judgment the plaintiff appealed, and the Supreme Court of the State affirmed the judgment, 59 Washington, 190, and the case comes here by writ of error.

The facts are as follows:—The defendants are husband and wife and full blooded Indians, and the lands in question are a part of what was the Columbia Indian Reservation. On July 7, 1883, in the City of Washington, the Secretary of the Interior and the Commissioner of Indian Affairs on the part of the United States, and Chief Moses and other Indians of the Columbia and Colville reservations in the then Territory of Washington, entered into a certain agreement, subject to the approval of Congress, the material parts of which are as follows:

"In the conference with Chiefs Moses and Sar-sarp-kin, of the Columbia reservation, and Tonasket and Lot, of the Colville reservation, had this day, the following was substantially what was asked for by the Indians:

"Tonasket asked for a saw and grist mill, a boarding school to be established at Bonaparte creek to accommodate one hundred (100) pupils, and physician to reside with them, and $100 (one hundred) to himself each year.

"Sar-sarp-kin asked to be allowed to remain on the Columbia reservation with his people, where they now live, and to be protected in their rights as settlers, and, in addition to the ground they now have under cultivation within the limit of the fifteen-mile strip cut off from the northern portion of the Columbia reservation, to be allowed to select enough more unoccupied land in severalty to make a total to Sar-sarp-kin of four square miles, being 2,560 acres of land, and each head of a family or male adult one square mile, or to remove onto the Colville reservation, if they so desire; and in case they so remove, and relinquish all their claims to the Columbia reservation, he is to receive one hundred (100) head of cows for himself and people, and such farming implements as may be necessary.

"All of which the Secretary agrees they should have, and that he will ask Congress to make an appropriation to enable him to perform.

"The Secretary also agrees to ask Congress to make an appropriation to enable him to purchase for Chief Moses a sufficient number of cows to furnish each one of his band with two cows; also to give Moses one thousand dollars ($1,000) for the purpose of erecting a dwelling house for himself; also to construct a saw mill and grist mill as soon as the same shall be required for use; also that each head of a family or each male adult person shall be furnished with one wagon, one double set of harness, one grain cradle, one plow, one harrow, one scythe, one hoe, and such other agricultural implements as may be necessary.

"And, on condition that Chief Moses and his people keep this agreement faithfully, he is to be paid in cash, in addition to all of the above, one thousand dollars ($1,000.00) per annum during his life.

"All this on condition that Chief Moses shall remove to the Colville reservation and relinquish all claims upon the government for any land situate elsewhere.

"Further, that the government will secure to Chief Moses and his people, as well as to all other Indians who may go onto the Colville reservation and engage in farming, equal rights and protection alike with all other Indians now on the Colville reservation, and will afford him any assistance necessary to enable him to carry out the terms of this agreement on the part of himself and his people; that until he and his people are located permanently on the Colville reservation his status shall remain as now, and the police—over his people shall be vested in the military, and all money or articles to be furnished him and his people shall be sent to some point in the locality of his people, there to be distributed as provided. All other Indians now living on the Columbia reservation shall be entitled to 640 acres, or one square mile, of land to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and protected; or, should they move onto the Colville reservation within two years, they will be provided with such farming implements as may be required, provided they surrender all rights to the Columbia reservation.

"All the foregoing is upon the condition that Congress will make an appropriation of funds necessary to accomplish the foregoing and confirm this agreement, and also, with the understanding that Chief Moses, or any of the Indians heretofore mentioned, shall not be required to remove to the Colville reservation until Congress does make such appropriation," etc.

This agreement was ratified and confirmed by act of Congress of July 4, 1884, c. 180, 23 Stat. 76, 79, which reads as follows:

"For the purpose of carrying into effect the agreement entered into at the city of Washington on the seventh day of July, eighteen hundred and eighty-three, between the Secretary of the Interior and the Commissioner of Indian Affairs and Chief Moses and other Indians of the Columbia

and Colville reservations, in Washington Territory, which agreement is hereby accepted, ratified, and confirmed, including all expenses incident thereto, eighty-five thousand dollars, or so much thereof as may be required therefor, to be immediately available: *Provided*, that Sarsopkin and the Indians now residing on said Columbia reservation shall elect within one year from the passage of this act whether they will remain upon said reservation on the terms therein stipulated or remove to the Colville reservation: *And provided further,* That in case said Indians so elect to remain on said Columbia reservation the Secretary of the Interior shall cause the quantity of land therein stipulated to be allowed them to be selected in as compact form as possible, the same when so selected to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the homestead laws only, except such portion thereof as may properly be subject to sale under the laws relating to the entry of timber lands and of mineral lands, the entry of which shall be governed by the laws now in force concerning the entry of such lands."

In the above agreement of July 7, 1883 (commonly called the Moses Agreement), the following clause is especially pertinent to the present controversy, *viz.:* "All other Indians now living on the Columbia Reservation shall be entitled to 640 acres, or one square mile, of land to each head of family or male adult, in the possession and ownership of which they shall be guaranteed and protected."

In the confirmatory act the following proviso is to be noted: "That in case said Indians so elect to remain en said Columbia Reservation the Secretary of the Interior shall cause the quantity of land therein stipulated to be allowed them to be selected in as compact form as possible. the same when so selected to be held for the exclusive use

and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers," etc.

By an executive order made by President Cleveland under date May 1, 1886 (Executive Orders, Indian Reserves, 1890, p. 75), the land in question was restored to the public domain, subject to the limitations as to disposition imposed by the act of July 4, 1884; it being, however, at the same time ordered that certain tracts of land surveyed for and allotted to Sar-sarp-kin and other Indians in accordance with the provisions of that act, and particularly described in the order, should be and the same were thereby set apart for the exclusive use and occupation of said Indians by name. Long Jim was not included.

But by a decision of the General Land Office rendered July 9, 1892, affirmed by the Secretary of the Interior January 6, 1893 (*Long Jim* v. *Robinson*, 16 L. D. 15), it was held that Long Jim, although not a party to the Moses Agreement, was entitled to its benefits by the terms of the act of July 4, 1884, and, because he and other members of a band of which he was the Chief were in actual occupancy of the land in question, having lived upon it for many years, cultivated a part of it, raised stock thereon, etc., it was also held, following *Mission Indians* v. *Walsh*, 13 L. D. 269, that the Executive Order of May 1, 1886, did not confer upon white men claiming under the preëmption and homestead laws any right to settle on, file upon, or enter lands that were in the occupation of the Indians. It was also held that Long Jim was not deprived of his rights under the act of July 4, 1884 by reason of not having elected within one year from its passage whether he would remain upon the Columbia Reservation on the terms therein stipulated or remove to the Colville Reservation; that limitation in the Act being construed to apply only to Sar-sarp-kin and the Indians who were

directly represented by him in the making of the Moses Agreement. The conclusion of the matter was that Long Jim and certain other Indian applicants were held entitled to have allotments made to them in severalty, in quantities and manner provided in the agreement of July 7, 1883, and the right of certain white claimants to the same land was held to be subordinate and subject to the prior and superior right of the Indians.

In accordance with this decision and in pursuance of the Moses Agreement and the act of Congress ratifying it, the Secretary of the Interior, in the year 1894, set apart for the exclusive use and occupation of Long Jim a certain allotment on the Columbia Reservation, included in which are the lands involved in the present action.

On March 29, 1900, Long Jim and his wife, by warranty deed, in consideration of the sum of two thousand dollars, assumed to convey the lands in question to the plaintiff. Up to this time no patent had been issued by the Government.

In April, 1904, the Secretary of the Interior held (*In re Long Jim*, 32 L. D. 568) that the act of July 4, 1894, had made no provision for issuing a patent; that if the Moses Agreement contemplated that patents should be issued, the act of ratification limited it in this respect; and that since there was no general authority of law for issuing patents to Indian allottees, none could be issued to cover Long Jim's allotment. Thereafter Congress, by act of March 3, 1905, c. 1479; 33 Stat. 1048, 1064, 1065; authorized the issuance of such a patent, in the following terms:

"That the Secretary of the Interior be, and hereby is, authorized and directed to issue a patent in fee to Long Jim for the lands heretofore allotted to him by the Secretary of the Interior on April eleventh, eighteen hundred and ninety-four, as modified and changed by Department order of April twentieth, eighteen hundred and

ninety-four, under and by virtae of the agreement con-
cluded July seventh, eighteen hundred and eighty-three,
by and between the Secretary of the Interior and the
Commissioner of Indian Affairs and Chief Moses and
other Indians of the Columbia and Colville reservations,
commonly known as the 'Moses agreement,' accepted,
ratified, and confirmed by the Act of Congress approved
July fourth, eighteen hundred and eighty-four (Twenty-
third Statutes, pages seventy-nine and eighty), and
under the decision of the General Land Office of July
ninth, eighteen hundred and ninety-two, affirmed by the
Department of the Interior January sixth, eighteen
hundred and ninety-three, to wit: the northeast quarter,
northeast quarter of the southeast quarter and lot one of
section eleven, the northwest quarter and southwest
quarter of the southwest quarter of section twelve, lot
one of section fourteen, and lots one and two of section
thirteen, township twenty-seven north, range twenty-two
east, Willamette meridian, Washington, free of all re-
strictions as to sale, incumbrance, or taxation."

And on August 2, 1905, pursuant to this authority, a
patent was issued to Long Jim for the lands that had been
allotted to him, including those that were included in his
deed to the plaintiff.

By act of March 8, 1906, c. 629; 34 Stat. 55; a general
provision was made for the issuance of patents for the
lands allotted to Indians under the Moses Agreement
and the act ratifying it, the patents to "be of legal effect
and declare that the United States does and will hold the
lands thus allotted for the period of ten years from the
date of the approval of this Act in trust for the sole use
and benefit of the Indian to whom such allotment was
made, or in case of his decease, either prior or subsequent
to the issuance of such patent, of his heirs, according to
the laws of the State of Washington, and that at the ex-
piration of said period the United States will convey the

same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever." The same act provided that an allottee holding such a trust patent might sell the lands covered thereby, except eighty acres, under rules and regulations prescribed by the Secretary of the Interior; and provided that any conveyance or contract of sale made within the trust period except as provided by the act, should be absolutely null and void.

The plaintiff in error contends (1) that the land allotted to Long Jim in the year 1894 passed to him in fee under the terms of the Moses Agreement and the act of ratification, and therefore passed to the plaintiff under the deed of 1900; and, failing this, (2) that the deed, having contained covenants of warranty, operated by way of estoppel to pass to the plaintiff the title afterwards acquired by Long Jim by virtue of the patent of August 2, 1905.

In *United States* v. *Moore*, 154 Fed. Rep. 712, it was held by the United States Circuit Court for the Eastern District of Washington that lands allotted to Indians in severalty under the Moses Agreement and the act of confirmation, and the Executive Order of May 1, 1886, became vested in the allottees in fee simple. The Circuit Court of Appeals reversed this decision. 161 Fed. Rep. 513. The Supreme Court of Washington, in the present case (52 Washington, 138), followed the reasoning and opinion of the Court of Appeals. We concur in the result reached, and have little to add.

As to the principles to be kept in view in construing an agreement with the Indians, we adhere to what was said in *Jones* v. *Meehan*, 175 U. S. 1, 10, 11,—

"In construing any treaty between the United States and an Indian tribe, it must always . . . be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of

a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians."

The Moses Agreement is quite informal, and it has been and should be construed in such manner as to confer upon the Indians the full measure of benefit that it was intended to secure to them. But it hardly follows that they would be more benefited by having the lands in fee than by having them held in trust for them by the Government. That part of the agreement now in question provided that each head of family or male adult on the Columbia Reservation should be entitled to one square mile of land—"in the possession and ownership of which they shall be guaranteed and protected." This is at least as consistent with a beneficial ownership, leaving the title in the Government, as with the vesting of a fee simple title in the Indian.

But whatever may have been the intent of the framers of the agreement, § 2079, Rev. Stat., prohibited the making of any contract with the Indians by treaty; and the Moses Agreement was expressly made "upon the condition that Congress will make an appropriation of funds necessary to accomplish the foregoing, and confirm this agreement." The act of confirmation (23 Stat., c. 180) was subject to the proviso that the Secretary of the Interior should cause the quantity of land stipulated to be selected in as compact

form as possible, "the same, when so selected, to be held for the exclusive use and occupation of said Indians, and the remainder of said reservation to be thereupon restored to the public domain, and shall be disposed of to actual settlers under the homestead laws," etc. Irrespective of the general recognition of the guardianship of the Government over the Indians, the clear antithesis in this proviso between the disposition of other lands to settlers and the retention of the lands in question for the use and occupation of the Indians, admits of but one construction.

The Executive Order of August 1, 1886, is consistent with this. So are the decisions of the General Land Office and the Secretary of the Interior, already referred to, (16 L. D. 15; 32 L. D. 568).

And the act of March 3, 1905 (33 Stat. 1048, 1064, c. 1479), above quoted, expressly authorizing and directing the Secretary of the Interior to issue a patent to Long Jim for the lands that had been allotted to him, is a recognition by Congress that without the act he had no right to the land in fee. Further corroboration is to be found in the act of March 8, 1906 (35 Stat. 55, c. 629), above quoted, which requires patents to be issued, with a restriction against alienation, to the other beneficiaries of the Moses Agreement.

The contention of the appellant that Long Jim had a title in fee at the time of the making of the warranty deed in the year 1900 must therefore receive a negative response.

As to the effect of the warranty upon the after-acquired title, while the general rule is that a conveyance with warranty estops the grantor, when he afterwards becomes the owner of the land assumed to be granted, to deny the grantee's title (Bigelow Estop., 2d ed., p. 324, etc.), it is well settled that the doctrine does not apply to the case of a conveyance made by one *non sui juris*, or that is contrary to public policy or statutory prohibition. *Bank of*

*America* v. *Banks*, 101 U. S. 240, 247; *Doe* v. *Ford*, 3 Ad. & El. 649; *Den ex dem. Wooden* v. *Shotwell*, 24 N. J. L. 789; *Connor* v. *McMurray*, 2 Allen (Mass.), 202, 204; *Doyle* v. *Coburn*, 6 Allen, 71, 72; *Merriam* v. *Boston &c. Railroad Co.*, 117 Massachusetts, 241, 244; *Brick* v. *Campbell*, 122 N. Y. 337, 346; *Kennedy* v. *McCartney*, 4 Porter (Ala.), 141, 158.

Since it is entirely plain, in the case before us, that the title to the lands in question was retained by the United States for reasons of public policy, and in order to protect the Indians against their own improvidence, it follows as matter of course that a conveyance made by one of them, before the title was vested in him pursuant to the act of 1905, was in the very teeth of the policy of the law, and could not operate as a conveyance, either by its primary force or by way of estoppel.

*Judgment affirmed.*