## UNITED STATES *v.* FIRST NATIONAL BANK OF DETROIT, MINNESOTA.

## UNITED STATES *v.* NICHOLS–CHISHOLM LUMBER COMPANY.

## UNITED STATES *v.* NICHOLS–CHISHOLM LUMBER COMPANY.

APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

Nos. 873, 874, 875. Argued April 7, 1914.—Decided June 8, 1914.

The natural and usual signification of plain terms is to be adopted as the legislative meaning in the absence of clear showing that something else was meant.

The rule that words in treaties with, and statutes affecting, Indians, must be interpreted as the Indians understood them is not applicable where the statute is not in the nature of a contract and does not require the consent of the Indians to make it effectual.

The after facts have but little weight in determining the meaning of legislation and cannot overcome the meaning of plain words used in a statute; nor can the courts be influenced in administering a law by the fact that its true interpretation may result in harsh consequences.

The responsibility for the justice and wisdom of legislation rests with Congress and it is the province of the courts to enforce, not to make, the laws.

The policy of the Government in enacting legislation is often an uncertain thing as to which opinions may vary and it affords an unstable ground of statutory construction.

Congress has on several occasions put full blood Indians in one class and all others in another class.

If a given construction was intended by Congress, which it would have been easy to have expressed in apt terms, other terms actually used will not be given a forced interpretation to reach that result.

While the early administration of a statute showing the departmental

construction thereof does not have the same weight which a long ob-
served departmental construction has, it is entitled to consideration
. as showing the construction placed upon the statute by competent
men charged with its enforcement.

Courts may not supply words in a statute which Congress has omitted;
nor can such course be induced by any consideration of public policy
or the desire to promote justice in dealing with dependent people.

The Clapp Amendments of June 21, 1906, 34 Stat. 325, 353, and
March 1, 1907, *Id.* 1015, 1034, removing restrictions imposed by the
act of February 8, 1887, upon alienation of Chippewa allotments
as to mixed bloods apply to mixed bloods of all degrees and not only
to those of half or more than half white blood. Such was not the
congressional intent as expressed in the statute and this court can-
not interpret the statute except according to the import of its plain
terms.

208 Fed. Rep. 988, affirmed.

THESE suits were brought by the United States in the
Circuit Court of the United States for the District of
Minnesota against the appellees to set aside certain con-
veyances under and through which the appellees claimed
title to lands, particularly described, in the White Earth
Indian Reservation in Minnesota. The decree of the Dis-
trict Court (which had succeeded the Circuit Court) in the
first two cases in favor of the Government was reversed
by the Circuit Court of Appeals for the Eighth Circuit,
while the decree dismissing the bill in the last case was
affirmed (208 Fed. Rep. 988).

By the treaty of March 19, 1867, 16 Stat. 719, creating
the White Earth Indian Reservation, the Chippewas of
the Mississippi ceded all their land in Minnesota, except
certain described tracts, to the United States and the
Government set apart the White Earth Reservation for
their use, and provision was made for the certification to
each Indian of not to exceed 160 acres of the land of such
reservation in lots of forty acres each, upon the cultivation
of ten acres, provided, that the land should be exempt
from taxation and sale for debt and should not be alienated.

except with the approval of the Secretary of the Interior and then only to a Chippewa Indian. The act of February 8, 1887, c. 119, 24 Stat. 388, provided for the allotment of land in the Indian reservations in severalty to the Indians and that (§ 5) upon the approval of the allotments patents should issue therefor in the name of the allottees, which should be of the legal effect and declare that the United States held the land for twenty-five years, in trust for the sole use and benefit of the Indian to whom the allotment was made, or, in case of his death, of his heirs, according to the laws of the State or Territory where the land was located, and that at the expiration of that time the United States would convey the same to the Indian or his heirs in fee, discharged of the trust and free of all charge or incumbrance whatsoever, provided that the President of the United States might in his discretion extend the period, and provided that any conveyance or contract touching the lands before the expiration of the trust period should be null and void. The Nelson Act of January 14, 1889, c. 24, 25 Stat. 642, provided for the relinquishment to the United States of that part of the reservation remaining after the allotment, subject to the act of February 8, 1887, *supra*, in severalty, to the Chippewa Indians in Minnesota, the act to become operative only upon the assent of a certain number of Indians being obtained. By the act of February 28, 1891, c. 383, 26 Stat. 794, the allotments were limited to eighty acres to each Indian, but by the Steenerson Act of April 28, 1904, c. 1786, 33 Stat. 539, the maximum allotments of the White Earth Reservation were made 160 acres. The acts of June 21, 1906, c. 3504, 34 Stat. 325, 353, and March 1, 1907, c. 2285, 34 Stat. 1015, 1034, in what is known as the Clapp Amendment, removed the restrictions upon alienation as respects mixed blood Indians, but left the matter, so far as full bloods were concerned, to the Secretary of the Interior.

The Government relied, in the first case, upon its title

to a certain parcel of land as a part of the public domain set apart as the White Earth Reservation, and the fact that, although under the various acts of Congress above mentioned authority was given to segregate certain parcels of land from others in the reservation and to allot them to members of the Band, and O-bah-baum, an Indian woman of that tribe, had been given a trust patent, as provided for by the act of February 8, 1887, *supra,* and had given a mortgage to the defendant in that case upon such land, she had no right or authority so to do. It prayed that the mortgage be annulled, as being a cloud upon the Government's title.

The allegations of the complaints in the second and third cases are the same, except that the allottee in the former is named Bay-bah-mah-ge-wabe and in the latter Equay-zaince, and in both cases that there are outstanding warranty deeds and mortgages, that there were intermediate parties not made parties of record, and that an accounting was asked for timber already cut and an injunction from cutting standing timber.

The defendant in the first case, besides denying that the reservation was a part of the public domain and alleging that the property was that of the Indians and that after selection the allottee acquired a fee simple title, notwithstanding the acts of Congress, particularly set up the fact that O-bah-baum is a mixed blood Chippewa Indian, and one of the class referred to in the Clapp Amendment, and therefore emancipated from the pretended supervision of the Government and able to transfer her property as a citizen of the United States. The defendant also alleged that under the facts, the Indians having made affidavit that they were mixed bloods and the good faith of the defendant, the Government should be required to place the defendant *in statu quo* before the relief asked could be granted. The Lumber Company, defendant in the second case, and the defendants in the third case, filed

answers of similar purport, with the additional averment that under the facts stated the matter relating to the timber was immaterial, but if the court found against defendant's title they would account for the timber cut by them.

By stipulation or introduction in evidence the following facts were made to appear:

The three Indians here involved are adult Chippewa Indians, residing upon the White Earth Reservation. O-bah-baum has some white blood, derived from a remote ancestor, but not to exceed one-thirty-second; Bay-bah-mah-ge-wabe has one-sixteenth of white blood, and Equay-zaince has one-eighth of white blood.

A question having arisen with reference to the construction of the term "mixed blood" as used in the treaty of September 30, 1854 (10 Stat. 1109), between the United States and the Chippewa Indians of Lake Superior and the Mississippi, the Commissioner of Indian Affairs in a letter to the Indian Agent at Detroit, Michigan, said that "the term 'mixed-bloods' has been construed to mean all who are identified as having a mixture of Indian and white blood. The particular proportion of each blood is, therefore, immaterial, where the provision is so broad as that stated in the treaty."

The Indian Agent at the White Earth Reservation after the passage of the Clapp Amendment came to Washington to consult the Commissioner of Indian Affairs, and was referred by him to the Land Division, and, after discussing the situation with a man represented to be in charge of such matters, it was agreed that the act did not require a showing of any definite quantum of foreign blood to constitute a mixed blood, and to his knowledge this was the construction generally adopted by those who dealt with the Indians on the White Earth Reservation. The Chief of the Land Division at the time of the passage of the Clapp Amendment testified that to his knowledge no ques-

tion was raised as to the quantum of foreign blood. In a communication dated October 6, 1910, to the Commissioner of Indian Affairs the Special Assistant to the Attorney General and the Special Indian Agent at Detroit, Minnesota, expressed the belief that the attorneys for the Government were going to contend that the term mixed blood should be interpreted to embrace only those of half or less of Indian blood, and cited a certain act of the United States (of February 6, 1909, c. 80, 35 Stat. 600) in which the term Indian was defined to include the aboriginal races inhabiting Alaska when annexed to the United States and their descendants of the whole or half blood, which act concerned the sale of liquor or firearms to an Indian or half breed. They also cited certain treaties with the Chippewas wherein it was shown that half breeds are persons of less than half blood and not regarded as Indians or members of the Chippewa nation: Article 3 of the treaty of July 29, 1837, 7 Stat. 536; article 4 of the treaty of October 4, 1842, 7 Stat. 591; article 4 of the treaty of August 2, 1847, 9 Stat. 904; article 6 of the treaty of February 22, 1855, 10 Stat. 1165; and article 4 of the treaty of March 19, 1867, 16 Stat. 719, from which it was summarized that in these treaties persons classed as half breeds or mixed bloods or less than half blood were not recognized by the Government or the Chippewas as Indians entitled to the rights and privileges of Chippewa Indians unless by special provisions of treaties, as theretofore shown. The Second Assistant Commissioner in his reply of November 19, 1910, stated that the Office was inclined to give the expressions "full bloods" and "mixed bloods" their ordinary meaning which would be more reasonable than to hold that the term full bloods included those of admitted pure blood and others above the half blood. It was also said in his letter, however, that a conference would be had with the Department of Justice, and further advice given. The Commissioner of Indian Affairs

said that he had never given an official construction to the term mixed blood.

It was stipulated that in administering the Bureau of Indian Affairs under the Clapp Amendment and especially in issuing patents thereunder, the Department had not required any statement as to the quantum of foreign blood, but had issued patents upon the showing that the applicant was a mixed blood. Several instances were shown by the records of allotments having been made to allottees on the White Earth Reservation having but one-sixteenth or one-thirty-second of Indian blood, while other instances were shown where allotment had been denied because applicant was of "doubtful blood."

A white man who had resided for a long time among the Chippewa Indians stated that in the early period the terms mixed blood and half breed were synonymous, applying to one of mixed white and Indian blood, irrespective of the percentage, and that later the term mixed blood was more commonly used, while the term half breed was applied to one having nearly equal parts of white and Indian blood. The general impression of business men in and about the White Earth Reservation was that any Indian who had white blood in his veins was a mixed blood.

Several very elderly Indians testified, however, that the Indians regarded the term mixed blood as applying to those having practically half white and half Indian blood.

The District Court, after stating that the question was one of first impression, said that Congress intended competency to be the test and came to the conclusion that an Indian having an admixture of one-eighth white blood might come within the term, but that beyond that the white blood would not affect the capacity of the Indian to manage his own affairs, and therefore dismissed the bill in the third case and entered a decree in favor of the complainants in the other two cases. The Circuit Court of Appeals reached the conclusion that every Chippewa

Indian having an identifiable mixture of other than Indian blood, however small, is a mixed blood Indian and all others are full blood Indians within the meaning of the Clapp Amendment, and accordingly reversed the decree of the District Court in the first two cases and affirmed the decree in the third case.

*The Solicitor General,* with whom *Mr. C. C. Daniels* and *Mr. W. A. Norton,* Special Assistant to the Attorney General, were on the brief, for the United States:

The history of the legislation involved shows the disastrous effects resulting from its improper application.

The term "mixed blood" is to be applied only to those Indians who possess a quantum of white blood amounting to one-half or more.

The act should be so construed as to subserve the well-defined and well-established policy of Congress. *Holy Trinity Church* v. *United States,* 143 U. S. 457; *Duroussea·* v. *United States,* 6 Cranch, 307; *Lionberger* v. *Rouse,* 9 Wall. 468, 475; *United States* v. *Freeman,* 3 How. 556; *United States* v. *Lacher,* 134 U. S. 624.

It has been the settled policy of Congress in dealing with the Indians to make competency alone the test for removing these restrictions. *Smith* v. *Stevens,* 10 Wall. 321, 326.

Congress having declared in plain and unmistakable language that lands allotted to these Indians would be held in trust for them for a period of twenty-five years, and the assent of the Indians to a cession of their reservation having been given in reliance upon that promise, no subsequent act of Congress should be construed to revoke this promise unless couched in language so plain and certain as to leave room for no other interpretation. *Lone Wolf* v. *Hitchcock,* 187 U. S. 553.

Assuming the competency of the white man and the incompetency of the Indians, it is but reasonable in mak-

ing a classification based on blood to include in the competent class all who have more than one-half white blood and in the incompetent class all who have more than one-half Indian blood.  *Holy Trinity Church* v. *United States,* 143 U. S. 457.

The act is to be interpreted according to the understanding of its terms among the Indians themselves.

Indian treaties and statutes modifying treaty rights will be construed as they are understood by the Indians and not necessarily in accordance with the technical terms employed by white men in framing them.  *Jones* v. *Meehan,* 175 U. S. 1; *Starr* v. *Long Jim,* 227 U. S. 613.

Provision for mixed bloods was made in treaties with the Chippewas by their request, and the identification of such mixed bloods was left to them.

That the Indians understood the words "mixed blood" in the sense for which the Government contends is clearly shown by uncontradicted testimony.

The meaning for which the Government contends is not foreclosed either by departmental construction or judicial decisions.

See also *Deweese* v. *Smith,* 106 Fed. Rep. 438; *Jeffries* v. *Ankeny,* 11 Ohio, 372; *Lane* v. *Baker,* 12 Ohio, 237; *Lone Wolf* v. *Hitchcock,* 187 U. S. 553; *Merritt* v. *Cameron,* 137 U. S. 542; *Nor. Pac. Ry. Co.* v. *United States,* 227 U. S. 355; *Thacker* v. *Hawk,* 11 Ohio, 376; *United States* v. *Kagama,* 118 U. S. 375.

*Mr. Ransom J. Powell,* with whom *Mr. George T. Simpson* and *Mr. Ernest C. Carman* were on the brief, for appellees:

The Clapp act was obviously designed to create an arbitrary classification.

The language is clear and explicit, and the term "mixed blood" had acquired a definite and well-understood meaning.

See 2 Kappler, Indian Laws and Treaties, pp. 147, 148, 173, 175, 207, 211, 218, 223, 269, 298, 301, 307, 338, 452, 464, 474, 492, 493, 499, 543, 568, 573, 649, 689, 692, 766, 774, 779, 798, 802, 841, 855, 862, 864, 881, 959, 975; Debates in Congress, 40 Cong. Record, pp. 1260 *et seq.*, 5738, 5739, 5784, 6041, 6044, 6046; vol. 41, p. 2337.

For definitions and use of "mixed blood" in decided cases, see Standard Dictionary; Century Dictionary; 14 Encyc. Britannica, 467; Hodge's Hand Book of American Indians, 1907, pp. 365, 850, and 913; 5 Words and Phrases, 4546; 27 Cyc. 811; *Hamilton v. Railway Co.*, 21 Mo. App. 152; *Daniel v. Guy*, 19 Arkansas, 121; *Thurman v. State*, 18 Alabama, 276; *Johnson v. Norwich*, 29 Connecticut, 407; *Van Camp v. Board of Education*, 9 Oh. St. 407; *Gentry v. McMannis*, 3 Dana (Ky.), 382; *Scott v. Raub*, 88 Virginia, 721, 727; *Jones v. Commonwealth*, 80 Virginia, 538; North Carolina Statutes, § 5, c. 71; § 81, c. 31, act of 1836; *State v. Dempsey*, 31 N. Car. 384; *State v. Chavers*, 50 N. Car. 11; *Hopkins v. Bowers*, 111 N. Car. 175; *State v. Davis*, 2 Bailey (S. Car.), 558; *Thacker v. Hawk*, 11 Ohio, 77.

The tendency at that time was toward the removal of restrictions by arbitrary act of Congress. Ann. Rep. Indian Comm. 1905, p. 3.

For the act of May 27, 1908, 35 Stat. 312, its history and the debate thereon, see 42 Cong. Record, pp. 5074–5078, 5425.

The interpretation of the term "mixed blood" necessitates the interpretation of the term "full blood." Congress made two classes, not three.

In seeking the intent of the legislature the first consideration is the natural, ordinary, and generally understood meaning of the terms used. *United States v. Fisher*, 2 Cr. 358; *Lake County v. Rollins*, 130 U. S. 662; *Sloan v. United States*, 118 Fed. Rep. 285; *United States v. Temple*, 105 U. S. 97; *Maillard v. Lawrence*, 16 How. 250; *United States v. Pacific Ry. Co.*, 91 U. S. 72; *Parsons v. Hunter*,

2 Sumn. (U. S.) 422; *Levy* v. *McCartee*, 6 Pet. 102, 110; *United States* v. *Goldenberg,* 168 U. S. 95, 102; *The Cherokee Tobacco*, 11 Wall. 616; *Edison &c. Co.* v. *U. S. Elect. Co.*, 35 Fed. Rep. 138.

A dispute over the meaning of a statute does not of itself show an ambiguity in the act. *Nor. Pac. Ry. Co.* v. *Sanders*, 47 Fed. Rep. 610; *Shreve* v. *Cheesman*, 69 Fed. Rep. 789; *Webber* v. *St. Paul City Ry. Co.*, 97 Fed. Rep. 140; *Swartz* v. *Siegel*, 117 Fed. Rep. 13.

Subsequent experience is no guide to interpretation. *United States* v. *Un. Pac. Ry. Co.*, 91 U. S. 72; *Platt* v. *Un. Pacific Ry. Co.*, 99 U. S. 48.

Where Congress has by apt terms created a class or drawn distinctions between classes of persons or objects it is not competent for the courts, under the guise of interpretation, to extend or limit the operation of the statute. *United States* v. *Colorado Co.*, 157 Fed. Rep. 321; *Brun* v. *Mann*, 151 Fed. Rep. 145; *United States* v. *Temple*, 105 U. S. 97; *Minor* v. *Bank*, 1 Pet. 44; *Folsom* v. *United States*, 160 U. S. 121; *United States* v. *Choctaw Nation*, 179 U. S. 494; *Pirie* v. *Chicago*, 182 U. S. 438, 451; *The Paulina*, 7 Cr. 52, 61; *Barintz* v. *Casey*, 7 Cr. 456, 468; *United States* v. *Goldenberg*, 168 U. S. 95, 102; *Maxwell* v. *Moore;* 22 How. 185, 191.; *Tiger* v. *Western Inv. Co.*, 221 U. S. 286; *Thurman* v. *State*, 18 Alabama, 276.

The court is not at liberty to amend the statute or read words into it to make it conform to what the court may believe to be the spirit of the act or to escape injustice of the law. *Maxwell* v. *Moore*, 22 How. 185; *United States* v. *Goldenberg*, 168 U. S. 95; *Hobbs* v. *McLean*, 117 U. S. 567; *In re Conway and Gibbons*, 17 Wisconsin, 526; 17 Op. Att'y Gen. 65; *St. Louis Co.* v. *Taylor*, 210 U. S. 281; *Hadden* v. *Barney*, 5 Wall. 107; *Gardner* v. *Collins*, 2 Pet. 92.

The practical construction by the Departments of the Government and the dealings of the citizens with the subject in reliance upon that construction is entitled to con-

sideration in cases of doubt. *United States* v. *Un. Pac. Ry. Co.*, 37 Fed. Rep. 551; *S. C.*, 148 U. S. 562; *Le Marchal* v. *Tegarden*, 175 Fed. Rep. 682; *Pennoyer* v. *McConnaughy*, 140 U. S. 1; *Malonny* v. *Mahar*, 1 Michigan, 26; *Westbrook* v. *Miller*, 56 Michigan, 148; *United States* v. *Alabama Ry. Co.*, 142 U. S. 615; *Kelly* v. *Multnomah County*, 18 Oregon, 356; *Schell* v. *Fauche*, 138 U. S. 562; *United States* v. *Moore*, 95 U. S. 760, 763; *Johnson* v. *Ballow*, 28 Michigan, 378; *Kirkman* v. *McClaughry*, 160 Fed. Rep. 436; *United States* v. *Bank of North Carolina*, 6 Pet. 29; 2 Op. Att'y Gen. 558; *In re State Lands*, 18 Colorado, 359; *Hill* v. *United States*, 120 U. S. 169, 182; *Blaxham* v. *Light Co.*, 36 Florida, 519; *Harrison* v. *Commonwealth*, 83 Kentucky, 162; *State* v. *Holliday*, 42 L. R. A. 826; *Iowa* v. *Carr*, 191 Fed. Rep. 257; *Heckman* v. *United States*, 224 U. S. 413; *United States* v. *Chandler-Dunbar Co.*, 152 Fed. Rep. 25; *United States* v. *Walker*, 139 Fed. Rep. 409; *Railway Co.* v. *First Division &c.*, 26 Minnesota, 31; *Menard* v. *Massey*, 8 How. 292; *Magee* v. *Hallett*, 22 Alabama, 699, 718.

Congress was familiar with apt terms to create a classification based upon a given quantum of Indian and other than Indian blood. If it had intended to make the classification urged by the Government, it could easily have said so. Indian treaties (previously cited); act of May 27, 1908, 35 Stat. 312; *Pennock* v. *Commissioners*, 103 U. S. 44; *Smith* v. *Bonifer*, 154 Fed. Rep. 883; *Farrington* v. *Tennessee*, 95 U. S. 679, 689; *Bank* v. *Mathews*, 98 U. S. 621, 627; *United States* v. *Koch*, 40 Fed. Rep. 250; *In re Drake*, 114 Fed. Rep. 229; *Moore* v. *U. S. Trans. Co.*, 24 How. 1, 32; *Shaw* v. *Railroad Co.*, 101 U. S. 557; *Harrington* v. *Herrick*, 64 Fed. Rep. 469; *Austin* v. *United States*, 155 U. S. 417; *In re Downing*, 54 Fed. Rep. 470, 474; 21 Op. Atty. Gen. 418; *Louisville Trust Co.* v. *Cincinnati*, 73 Fed. Rep. 726; *Parker* v. *United States*, 22 Ct. Cl. 104; *Grace* v. *Collector of Customs*, 79 Fed. Rep. 319; *Strode* v. *Stafford Justices*, 1 Brock. (U. S.) 162; *Ryan* v. *Carter*, 93

U. S. 83; *Tompkins* v. *Little Rock*, 125 U. S. 127; *United States* v. *Ryder*, 110 U. S. 739; *Leavenworth* v. *United States*, 92 U. S. 744; *Butz* v. *Muscatine*, 8 Wall. 580; *James* v. *Milwaukee*, 16 Wall. 161; *United States* v. *Anderson*, 9 Wall. 66; *Lawrence* v. *Allen*, 7 How. 796; *Nor. Pac. Ry. Co.* v. *Dudley*, 85 Fed. Rep. 86; *In re Baker*, 96 Fed. Rep. 957; *In re Bauman*, 96 Fed. Rep. 948; *Steele* v. *Buell*, 104 Fed. Rep. 970; *United States* v. *Slazengerm*, 113 Fed. Rep. 525; *Ex parte Byers*, 32 Fed. Rep. 409; *Ulman* v. *Meyer*, 10 Fed. Rep. 243; *Hall's Case*, 17 Ct. Cl. 46; *The Cherokee Tobacco*, 11 Wall. 616; *Gardner* v. *Collins*, 2 Pet. 87.

MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

Before the transfers here complained of and while the lands were held in trust, subject to the provisions of the act of February 8, 1887, *supra*, the Clapp Amendment was passed, having the purpose of removing the restrictions upon alienation in certain cases. This act provides, (34 Stat., p. 1034):

"That all restrictions as to sale, incumbrance, or taxation for allotments within the White Earth Reservation in the State of Minnesota, heretofore [amended March 1, 1907, the word 'heretofore' being substituted for the word 'now'] or hereafter held by adult mixed-blood Indians, are hereby removed, and the trust deeds heretofore or hereafter executed by the Department for such allotments are hereby declared to pass the title in fee simple, or such mixed bloods upon application shall be entitled to receive a patent in fee simple for such allotments; and as to full bloods, said restrictions shall be removed when the Secretary of the Interior is satisfied that said adult full-blood Indians are competent to handle their own affairs, and in such case the Secretary of the Interior shall issue to such Indian allottee a patent in fee simple upon application."

It is at once apparent from reading this act that it deals with two classes, adult mixed blood Indians, concerning whom all restrictions as to sale, incumbrance or taxation are removed, and full blood Indians, whose right to be free from restrictions shall rest with the Secretary of the Interior, who may remove the same upon being satisfied that such full blood Indians are competent to handle their own affairs.

This case turns upon the construction of the words "mixed blood Indians." It is the contention of the Government that mixed blood means those of half white or more than half white blood, while the appellees insist, and this was the view adopted by the Circuit Court of Appeals, that the term mixed blood includes all who have an identifiable mixture of white blood. If the Government's contention be correct, it follows that for the purposes of this suit all of less than half white blood must be regarded as full blood Indians, all others as mixed bloods. Upon the appellees' contention the line is drawn between full bloods as one class and all having an identifiable admixture of white blood as the other.

If we apply the general rule of statutory construction that words are to be given their usual and ordinary meaning, it would seem clear that the appellees' construction is right, for a full blood is obviously one of pure blood, thoroughbred, having no admixture of foreign blood. That this natural and usual signification of plain terms is to be adopted as the legislative meaning in the absence of clear showing that something else was meant, is an elementary rule of construction frequently recognized and followed in this court. *United States* v. *Fisher*, 2 Cranch, 358, 399; *Lake County* v. *Rollins*, 130 U. S. 662, 670; *Dewey* v. *United States*, 178 U. S. 510, 521. Interpreted according to the plain import of the words the persons intended to be reached by the clause are divided into two and only two well-defined classes, full blood Indians and mixed

bloods. There is no suggestion of a third class, having more than half of white blood. or any other proportion than is indicated in the term mixed blood, as contrasted with full blood. If the Government's contention is correct, the Indians of .full blood must necessarily include half bloods, and mixed bloods must mean all having less than half white blood and none others. Such construction is an obvious wresting of terms .of plain import from their usual and well-understood signification.

But the Government insists that to effect the legislative purpose the words must be interpreted as the Indians understood them, and cases from this court (*Jones* v. *Meehan,* 175 U. S. 1; *Starr* v. *Long Jim,* 227 U. S. 613) are cited to the effect that Indian treaties and acts to which the Indians must give consent before they become operative must be interpreted so as to conform to the understanding of the Indians as to the meaning of the terms used. The justice and propriety of this method of interpretation is obvious and essential to the. protection of an unlettered race, dealing with those of better education and .skill, themselves framing contracts which the Indians are induced to sign. But the legislation here in question is not in the nature of contract and contains no provision that makes it effectual only upon consent of the Indians whose rights and privileges are to be affected. Evidently this legislation contemplated in some measure the rights of others who might deal with the Indians, and obviously was intended to enlarge the right to acquire as well as to part with lands held in trust for the Indians.

The Government refers, in support of its contention, to reports of Congressional committees, showing after effects of this legislation, which was followed, as the reports tend to show, by improvident sales and incumbrances of Indian lands and wasteful extravagance in the disposition of the proceeds of sales, resulting in suffering to the former proprietors of the lands sold and mortgaged. But

these after facts can have little weight in determining the meaning of the legislation and certainly cannot overcome the meaning of plain words used in legislative enactments. If the effect of the legislation has been disastrous to the Indians, that fact will not justify the courts in departing from the terms of the act as written. If the true construction has been followed with harsh consequences, it cannot influence the courts in administering the law. The responsibility for the justice or wisdom of legislation rests with the Congress, and it is the province of the courts to enforce, not to make, the laws. *St. Louis, Iron Mt. & S. Ry. Co.* v. *Taylor*, 210 U. S. 281, 294; *Texas Cement Co.* v. *McCord*, 233 U. S. 157, 163.

The Government further insists that its interpretation of the act is consistent with its policy to make competency the test of the right to alienate, and that the legislation in question proceeds upon the theory that those of half or more white blood are more likely to be able to take care of themselves in making contracts and disposing of their lands than those of lesser admixture of such blood. But the policy of the Government in passing legislation is often an uncertain thing, as to which varying opinions may be formed, and may, as is the fact in this case, afford an unstable ground of statutory interpretation. *Hadden* v. *The Collector*, 5 Wall. 107, 111. And again Congress has in other legislation not hesitated to place full blood Indians in one class and all others in another. *Tiger* v. *Western Investment Co.*, 221 U. S. 286. In that case this court had occasion to deal with certain sections of the act of April 26, 1906, c. 1876, 34 Stat. 137, providing that no full blood Indian of certain tribes should have power to alienate or incumber allotted lands for a period of twenty-five years, unless restrictions were removed by act of Congress. By section 22 of the act all adult heirs of deceased Indians were given the right to convey their lands, but for the last sentence of the section which kept full

blood Indians to their right to convey under the supervision of the Secretary of the Interior. Therefore all adult heirs of any deceased Indian other than a full blood might convey, but the full blood only with the approval of the Secretary of the Interior. In this important provision the restrictions were removed as to all classes of Indians other than full bloods. In other words, there as here, the Indians were divided into two classes, full bloods in one class and all others in the second class.

Furthermore, the appellees' construction accords with the departmental construction, as shown by the facts stipulated. Such was the construction given by the Indian Commissioner to the treaty of September 30, 1854, *supra*, wherein provision was made for mixed blood Indians among the Chippewas, and the Indian agent at Detroit, Michigan, was instructed by the Indian Commissioner that the term mixed blood had been construed to mean all who are identified as having a mixture of Indian and white blood. Such was the interpretation of the Department of Interior, in the first place at least, in administering the matter under the Clapp Amendment. It is true that the Government representatives at Detroit, Minnesota, were of the opposite opinion, for the reasons we have stated above, and that the Second Assistant Commissioner in his reply, while reaching the conclusion we have, stated that he would confer with the Department of Justice.

While departmental construction of the Clapp Amendment does not have the weight which such constructions sometimes have in long continued observance, nevertheless it is entitled to consideration,—the early administration of that amendment showing the interpretation placed upon it by competent men having to do with its enforcement. The conviction is very strong that if Congress intended to remove restrictions only from those who had half white blood or more, it would have inserted in the

act the words necessary to make that intention clear, that is, we deem this a case for the application of the often expressed consideration, aiding interpretation, that if a given construction was intended it would have been easy for the legislative body to have expressed it in apt terms. *Farrington* v. *Tennessee*, 95 U. S. 679, 689; *Bank* v. *Matthews*, 98 U. S. 621, 627; *Tompkins* v. *Little Rock & Ft. S. R. Co.*, 125 U. S. 109, 127; *United States* v. *Lexington Mill Co.*, 232 U. S. 399, 410.

Congress was very familiar with the situation, the subject having been before it in many debates and discussions concerning Indian affairs. This was a reservation inhabited by Indians of full blood and others of all degrees of mixed blood, some with a preponderance of white blood, others with less and many with very little. If Congress, having competency in mind and that alone, had intended to emancipate from the prevailing restriction on alienation only those who were half white or more, by a few simple words it could have effected that purpose. We cannot believe that such was the congressional intent, and we are clearly of opinion that the courts may not supply the words which Congress omitted. Nor can such course be induced by any consideration of public policy or the desire to promote justice, if such would be its effect, in dealing with dependent people.

We reach the conclusion that the Circuit Court of Appeals rightly construed this statute, and its decrees are

*Affirmed.*