## CHOUTEAU v. COMMISSIONER OF INTERNAL REVENUE. BLACKBIRD v. SAME. PETTIT v. SAME.* †
### Nos. 12, 13, 14.

Circuit Court of Appeals, Tenth Circuit.
Feb. 5, 1930.

T. J. Leahy, of Pawhuska, Okl. (C. S. Macdonald, of Pawhuska, Okl., J. H. Maxey, of Tulsa, Okl., F. W. Files, of Pawhuska,

*Certiorari granted 50 S. Ct. 410, 74 L. Ed. —.

† Certiorari denied 50 S. Ct. 410, 74 L. Ed .—.

Okl., and, in No. 13, J. M. Humphreys, Osage Indian Tribal Atty., of Pawhuska, Okl., on the briefs), for petitioners.

Preston C. Alexander, of Washington, D. C. (Sewall Key and Morton P. Fisher, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Shelby S. Faulkner, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before LEWIS, COTTERAL, and Mc-DERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

These are Federal Income Tax Cases. The Board of Tax Appeals affirmed a deficiency order made by the Commissioner against each of the petitioners. The cases were argued and submitted together, but are different in their facts.

■ 1. Mary Blackbird is a restricted full-blood member of the Osage Tribe of Indians. As such member she received her allotments under the Osage Allotment Act of June 28, 1906 (34 Stat. 539), and she inherited a third interest in the allotment of another member. The claimed deficiencies against her are for the years 1920 and 1921. All the lands that were allotted under the Act were purchased by the United States from the Cherokee Nation in 1883 with funds that belonged to the Osage Tribe, and the title thereto taken in the name of the United States in trust for the use and benefit of the Osages. Each member of the tribe, appearing on the roll provided for in the Act, made three selections of 160 acres each, one of which was designated as a homestead; and the remainder of the lands was then equally divided between them. Section 2 of the Act made the homestead allotment inalienable and nontaxable for a period of 25 years, and the remainder of the lands so divided inalienable for 25 years, unless the allottee procured from the Secretary of the Interior a certificate of competency which would authorize him to sell and convey all of his allotted lands except his homestead. The certificate of competency would also immediately render the lands (except the homestead) subject to taxation, and in any event they were taxable on the expiration of three years from the approval of the Act. Mary Blackbird has never had a certificate of competency. The oil, gas, coal and other minerals covered by the allotted lands were reserved by the Act to the use of the tribe for a period of 25 years,—now extended to April 8, 1958, by the Act of March 2, 1929 (45 Stat. 1478),—thus segregating the mineral deposits from all of the allotted lands for a term of years. The mineral deposits, particularly of oil and gas, under much of the land has proved to be of great value. The Allotment Act authorized the tribe, through its tribal counsel, and with the approval of the Secretary of the Interior, to grant leases for extraction of these minerals and provided that the royalties received therefrom should be placed in the treasury of the United States to the credit of the members of the tribe and distributed to the individual members according to the tribal roll provided for in the Act, in the manner and at the same time that payments were made of interest on other moneys held in trust for the Osages by the United States, each member receiving his pro-rata share. There were other funds held then and now by the United States that belonged to the tribe, and they also were to be placed to the credit of the members on a basis of a pro-rata division among them, as shown by the tribal roll. By the Act all property interests of intestate deceased members descend to his or her legal representatives according to the laws of Oklahoma. The principal part of Mary Blackbird's gross income for the two years was her share of bonuses and royalties on tribal mineral leases. However, she received $480 each year as surface rental from the homestead allotted to her, $100 each year as interest on funds held in trust for her by the United States, and a few additional dollars from miscellaneous sources. She and the other petitioners contend that they are not only not liable for the amounts named under the deficiency orders but that they are not subject to the income tax statute. As to Mary Blackbird, we are disposed to yield our assent to the soundness of the contention. She is a restricted full-blood Osage. Her property is under the supervising control of the United States. She is its ward, and we cannot agree that because the income statute, Act of 1918 (40 Stat. 1057), and Act of 1921 (42 Stat. 227), subjects "the net income of every individual" to the tax, this is alone sufficient to make the Acts applicable to her. Such holding would be contrary to the almost unbroken policy of Congress in dealing with its Indian wards and their affairs. Whenever they and their interests have been the subject affected by legislation they have been named and their interests specifically dealt with. Elk v. Wilkins, 112 U. S. 94, 100, 5 S. Ct. 41, 44, 28 L. Ed. 643: "General acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them." In Choate v. Trapp, 224 U. S. 665, 32 S. Ct. 565, 56 L. Ed. 941, the

court, after noting the general rule that exemptions from taxation are to be strictly construed, said at page 675 of 224 U. S., 32 S. Ct. 565, 569:

"But in the government's dealings with the Indians the rule is exactly the contrary. The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years, and has been applied in tax cases."

Cases are cited. This is the view taken of the matter by the Attorney General in several opinions. 34 Ops. Attys. Gen. 439; 35 Ops. Attys. Gen. 1,107. In the first opinion cited the Attorney General among other things said:

"This practice of safeguarding the Indian has been continuously adhered to. Treaties have been considered, not according to their technical meaning, but in the sense in which they would be naturally understood by the Indians. Choctaw Nation v. United States, 119 U. S. 1 [7 S. Ct. 75, 30 L. Ed. 306]; United States v. Choctaw Nation, 179 U. S. 494 [21 S. Ct. 149, 45 L. Ed. 291]; Seufert Brothers v. United States, 249 U. S. 194 [39 S. Ct. 203, 63 L. Ed. 555]; Starr v. Long Jim, 227 U. S. 613 [33 S. Ct. 358, 57 L. Ed. 670]; United States v. Payne, 264 U. S. 446 [44 S. Ct. 352, 68 L. Ed. 782]. This same rule of liberal construction has also been followed in the interpretation of statutes relative to the Indians. Cherokee Intermarriage Cases, 203 U. S. 76 [27 S. Ct. 29, 51 L. Ed. 96]; United States v. Celestine, 215 U. S. 278 [30 S. Ct. 93, 54 L. Ed. 195]; Choate v. Trapp, 224 U. S. 665 [32 S. Ct. 565, 56 L. Ed. 941]. It is well established that general Acts of Congress do not apply to Indians, unless so worded as clearly to manifest an intention to include Indians in their operation. Elk v. Wilkins, 112 U. S. 94 [5 S. Ct. 41, 28 L. Ed. 643]. The Indian has always been the object of special legislation. Never has it been the practice to legislate for him generally along with the rest of the people."

In the second opinion cited the Attorney General (35 Ops. Attys. Gen. 4) said this:

"The principle was emphasized that general acts of Congress do not apply to Indians unless so worded as to manifest a clear intention to include them; that Indians have always been the object of special legislation, and that general legislation, and especially revenue laws, which burden and restrict the use and enjoyment of property, should not be applied to Indians, unless Congress in clear and unambiguous language so directs. * * * Such a wide departure from the prior legislative policy should not be assumed from doubtful implication, but should be recognized as existing only upon the enactment of legislation expressly so providing."

A familiar instance of the restraint of general words and sweeping expressions in an Act is the case of Church of the Holy Trinity v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; and in United States v. Kirby, 7 Wall. 482, 486, 19 L. Ed. 278, we find this:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

The mineral reserves under the lands are held in trust by the United States for the tribe and its members, and are being developed under its control and direction as an instrumentality for the best interests and advancement of the members of the tribe who are still recognized as dependents on Governmental care; and it seems unreasonable to hold that a general tax statute should be applied to them when they are not named nor intention in some way expressed that it applies to them. Counsel for respondent rely on The Cherokee Tobacco Case, 11 Wall. 616, 20 L. Ed. 227; but the opinion in that case, as a precedent, seems to have been nullified by what is said in United States v. Forty-three Gallons of Whiskey, 108 U. S. 491, 2 S. Ct. 906, 27 L. Ed. 803. The case of Mary Blackbird is therefore reversed.

■ 2. Mrs. Pettit is a white woman without Indian blood. She is not a member of the Osage Tribe of Indians. She inherited from her children, who were members of the Tribe, lands that had been allotted to them under the Act of June 28, 1906. All of her gross income here involved was her pro-rata part of the income of the tribe from oil and gas leases made by said tribe with the approval of the Secretary under said Act. Her claimed deficiencies were for the years 1919, 1920, 1921 and 1922. She also claims that she is not subject to the income tax statute. Her children were without certificates of compe-

tency from the Secretary of the Interior, but we think it clear under the ruling in Levindale Lead & Zinc Co. v. Coleman, 241 U. S. 432, 36 S. Ct. 644, 60 L. Ed. 1080, that their mother took their lands without any restrictions on its disposition. The United States has no control over her interests and she is in no sense its ward. She receives her share of the royalties and bonuses on the mineral deposits in accordance with the terms of the Act, but it is not held and paid to her on the part of the Government for her protection as its dependent ward. See also Mixon v. Littleton (C. C. A.) 265 F. 603. As to her the ruling of the Board of Tax Appeals is affirmed.

█ 3. Henry Chouteau is a member of the Osage Tribe, but his quantum of Indian blood is not stated in the record. Tribal lands were allotted to him under the Osage Allotment Act and his gross income for the years in question, 1918, 1919 and 1920, was his prorata share from tribal mineral leases given with the approval of the Secretary under the Act of June 28, 1906. In addition to his own allotments he was the owner by inheritance of land allotted to another member of the tribe. He applied for and received from the Secretary of the Interior a certificate of competency bearing date March 5, 1910, which is provided for by the Act of June 28, 1906, paragraph 7 of section 2 of said Act (34 Stat. 542), reading thus:

"That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this Act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: Provided, That upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States. * * * "

The certificate of competency issued to Henry Chouteau reads thus:

"Whereas, Henry Chouteau, a member of the Osage Tribe of Indians, has made application for the issuance of a Certificate of Competency under the provisions of paragraph 7 of Section 2 of the Act of Congress approved June 28, 1906 (34 Stat. L., 539–542); and,

"Whereas, upon investigation, consideration and examination of the request, Henry Chouteau has been found to be fully competent and capable of transacting his own business and caring for his own individual affairs.

"Now, therefore, the First Assistant Secretary of the Interior, by virtue of the power and authority vested in him by paragraph 7 of Section 2 of said Act of Congress of June 28, 1906, does hereby issue to said Henry Chouteau, this Certificate of Competency, and does hereby invest him with full power and authority to sell and convey any or all surplus lands deeded him under the provisions of said Act of Congress, except the minerals therein, which are reserved for the use of the Osage Tribe for a period of twenty-five years from April 8, 1906, and does hereby declare him to be fully competent and capable of managing and caring for his individual affairs.

"Done at the City of Washington this Mar. 5, 1910.

"Frank Pierce,
"First Assistant Secretary of the Interior."

The Act of April 18, 1912 (37 Stat. 86), also deals with certificates of competency. Section 7 in part reads:

"That the lands allotted to members of the Osage tribe shall not in any manner whatsoever be encumbered, taken, or sold to secure or satisfy any debt or obligation contracted or incurred prior to the issuance of a certificate of competency, or removal of restrictions on alienation; nor shall the lands or funds of Osage tribal members be subject to any claim against the same arising prior to grant of a certificate of competency."

Apparently the purpose of the statute in authorizing the certificate and its subsequent issuance was to fully emancipate the Indian receiving it from further Governmental control and supervision of his property, except his homestead. Chouteau's gross income for the three years was wholly his pro-rata share of royalties and bonuses on the mineral produced for those years. His certificate of competency bestowed upon him unrestricted management of his affairs and gave him full power to use and dispose of his property according to his own judgment. Thereafter his pro-rata share in the mineral production was

paid to him not as a ward of the Government. It was paid to him under the terms of the Act, but was not a Governmental instrumentality and means to gradually bring him to a state of competency and independence. By provision of the Act it was determined that he was competent to have exclusive management of his own affairs when the certificate was issued to him. He obtained it at his request and with the Government's consent and approval, and thereupon he assumed the same burdens that the law imposes on every other individual property owner. We think his civil status thus fixed brought him within the terms of the income tax statutes. As to him the ruling of the Board of Tax Appeals is therefore affirmed.