ME-SHING-GO-ME-SIA and Another *v.* THE STATE and Another.

INDIAN RESERVATION.—*Taxation.*—*Statute.*—The lands reserved by the treaty between the United States and the Miami Indians, in 1838, to the band of Ma-to-sin-ia and referred to in the treaty of 1840, in which the United States agreed to convey by patent said lands to Me-shing-go-me-sia, in trust for his band, and the personal property of said band, are not liable to taxation for state, county, and other purposes. Nor are these lands included in the ninth section of the act of June 21st, 1852, 1 G. & H. 70.

APPEAL from the Grant Circuit Court.

DOWNEY, J.—This was a proceeding in the nature of a mandate to require and compel the appellant, Gauntt, as county treasurer, to assess the property, real and personal, of the said Me-shing-go-me-sia and other Indians of the Miami tribe in Grant county, and charge the same with the appropriate taxes.

There was a demurrer to the complaint for the reason that it did not contain facts sufficient to constitute a cause of action, and because there was a defect of parties plaintiffs and defendants, in this: first, that the other members of the band mentioned in the complaint are not made defendants; and second, that neither the commissioners of Grant county nor the county of Grant are made parties plaintiffs. This demurrer was overruled, and the defendants excepted. Answer of general denial; trial by the court on an agreed statement of facts.

The court found for the plaintiffs, that the lands in the complaint specified are liable and subject to taxation for state, county, and other taxes, both current and delinquent; that the personal property of said persons in the complaint mentioned is subject and liable to taxation as the property of other citizens; that the auditor and other officers of said county had failed to cause said lands and property to be placed on the proper duplicate, and charged with taxes as other property; that said lands and property are liable to be, and should be, charged with taxes according to law.

The defendants moved for a new trial, because the decision of the court was not sustained by sufficient evidence, was not sustained by the agreed statement of facts, and because the court overruled the demurrer to the complaint.

This motion was overruled, and the defendants excepted. They then moved in arrest of judgment, which motion was also overruled, and they again excepted.

The court then rendered final judgment. A bill of exceptions sets out the agreed statement of the facts, which was all the evidence in the case.

The errors assigned are, first, the overruling of the demurrer to the complaint; second, overruling the motion for a new trial; third, overruling the motion in arrest of judgment.

Whether the question is decided on the demurrer to the complaint, or on the facts, the case is the same, so far as the main point is concerned. The question is, whether the lands and personal property of Me-shing-go-me-sia and the members of his band are liable to taxation, or not. No other point is argued or urged upon us, and we shall decide no other.

The agreed statement of facts is as follows:

"The lands in question in this suit are a part of a reservation containing six thousand four hundred acres, reserved by the Miami Indians in their treaty of 1838 with the United States to the band of Ma-to-sin-ia, which reserve is again referred to in the treaty of 1840, between the same parties,

by which, as amended by the Senate, the United States agreed to convey said land by patent to Me-shing-go-me-sia, the son of Ma-to-sin-ia, in trust for his band, who have ever since resided upon the same; that Me-shing-go-me-sia has ever since been the head man, or chief, of his band; that about two thousand two hundred acres of said lands are within the bounds of Grant county, and the balance in Wabash county. About the year 1846, a portion of the Miami tribe of Indians were removed to their present home, west of the Mississippi, now in the state of Kansas, and placed on lands ceded to them by the government. By the terms of the treaty of 1840, Me-shing-go-me-sia and his band were not required to go west, but remained upon said reserve. A few of the Indians, now residing on the lands in question, went, or were removed to Kansas and returned, and some remain without leave and have remained on and about said lands ever since. All of said Indians except those who have deceased have so lived on and about these lands, making their living, working, and farming these lands, and trading with the citizens around them. They have also always received annuities that the government under treaty stipulations has paid them each year, which is referred to in said treaties, including the treaty made with them in 1854.

"Soon after 1845, said Indians commenced improving said lands, which were mostly taken possession of and occupied by the heads of families, and some others commenced making farms, and have continued said improvements from that time to the present. On some of the improvements more, and on others less is cleared. The lands in Grant county contain eleven or twelve farms, and the amount cleared is about one thousand acres. Each Indian making improvements enjoys the proceeds thereof, as also does his family and brothers after him according to the ancient customs of the Miami nation. About the year 1867, their band having had some trouble about individual members selling timber growing on said reservation to the whites, it was determined in general council of the band that no more timber

should be sold by any Indian on lands not by him fenced. Houses and other buildings have been made and are now occupied, some by the Indians, and some by white men, lessees of the Indians. Their ancient customs are considerably broken in upon by the manners and customs of the whites, with whom, however, the Indians hold comparatively little intercourse, from choice.

"They settle their troubles among themselves, without resorting to our courts. In their intercourse with each other they speak their own language. The greater part of them cannot speak the English language intelligibly. Their tribal organization still remains. They still hold their councils for the same purposes as in former times, and are governed by their ancient customs. They do not go to the courts for the settlement of decedents' estates, nor do they have guardians appointed for minors by our courts. They never vote at elections, they have paid neither road nor poll tax. This reserve has never been surveyed or laid off into sections. No part of said reserve has been conveyed by patent from the United States to any or all of said band, or to Me-shing-go-me-sia, in trust for them, but their title thereto remains the same as when the treaty of 1840 aforesaid was perfected. They have a church of which the greater part of them are members. They sue when necessary in our courts, and the rights of other citizens are generally conceded them. The persons (Indians) so occupying said lands have personal property, such as horses, cattle, stock, on their improvements, farming utensils, implements of husbandry, etc.

"All laws, treaties, and history bearing upon this cause are to be considered by the court in determining the questions involved in this suit. These lands are worth about fifty dollars per acre, and said reservation is surrounded by well improved farms. The children belonging to said tribe are not received into the public schools of said county. The marriages between the members of said tribe are governed and celebrated according to the ancient usages of the Miami nation, and not according to the laws of Indiana. They

obtain no marriage license from the county clerk, as is done in marriages between white persons. The members of said band never resort to the courts for divorces, but their divorces are regulated by the usages of their tribe.

"About three heads of families, residing on their reserve in Wabash county, refuse to act with Me-shing-go-me-sia on account of personal matters. It is hereby agreed by the parties to this action, that the foregoing are the facts in the case. It is also agreed that should the law of the case, under the evidence agreed on, be against the defendants, then their cause shall be decided against them, otherwise in their favor. October 14th, 1870." The clause of the treaty of 1838 referred to is as follows:

"Art 2. From the cession aforesaid, the Miami tribe reserve for the band of Ma-to-sin-ia, the following tract of land, to-wit: Beginning on the eastern boundary line of the big reserve, where the Mississinnewa river crosses the same; thence down said river with the meanders thereof, to the mouth of the creek called Forked Branch; thence north two miles; thence in a direct line to a point on the eastern boundary line two miles north of the place of beginning; thence south to the place of beginning, supposed to contain ten square miles."

The clause in the treaty of 1840, referred to, as amended by the Senate, and afterward assented to, is as follows:

"Art. 7. It is further stipulated, that the United States convey by patent, to Me-shing-go-me-sia, son of Ma-to-sin-ia, the tract of land reserved by the second article of the treaty of the 6th of November, 1838, to the band of Ma-to-sin-ia. And the same provision made in favor of John B. Richardville and family, in the fourteenth article of the treaty of the 6th of November, 1838, is hereby granted and extended to the above named Me-shing-go-me-sia, and to his brothers."

The clause in the treaty of 1838, to which reference is made, is as follows:

"Art. 14. And whereas John B. Richardville, the principal chief of said tribe, is very old and infirm, and not well

able to endure the fatigue of a long journey, it is agreed that the United States will pay to him and his family the proportion of the annuity of said tribe which their number shall indicate to be due to them, at Fort Wayne, whenever the said tribe shall emigrate to the country to be assigned them west, as a future residence."

It is hardly worth our while to enter upon the consideration of the question as to the nature of the title by which these Indians hold this land. It is spoken of in the treaty of 1838 as a reservation to the band of Ma-to-sin-ia. In the treaty of 1840, it is stipulated that the United States convey by patent to Me-shing-go-me-sia. We think it safe to conclude that. by the reservation and the conveyance made by the United States, or agreed to be made, the Indians have a title not inferior to that which the tribe possessed before any treaty was made. See *Wheeler* v. *Me-shing-go-me-sia*, 30 Ind. 402.

It is provided by statute in this State, that " all lands reserved to or for any individual, by any treaty between the United States and any Indian tribe or nation, shall be liable to taxation from the time such treaty shall have been confirmed." 1 G. & H. 70, sec. 9.

It is contended by the appellees that the lands. in question are made taxable by this section of the statute. But we think it does not meet the case. It applies to reservations for individuals. This was not a reservation of that kind, but was " for the band of Ma-to-sin-ia." Counsel for appellees refer us also to the case of *Frederickson* v. *Fowler*, 5 Blackf. 409, as settling the question. But the land held to be taxable in that case was a reservation to an individual, and he had sold the same to a citizen. It was held to be taxable in the hands of such citizen. There was no discussion or decision of the question in that case which is involved in this one.

We are also referred by the appellees to the case of *Roche* v. *Washington*, 19 Ind. 53. But this point was not involved in that case. The learned judge who delivered the opinion

said, " The question intended to be presented for our decision in this cause is, whether the courts of Indiana will hold valid, as marriages, such unions, and as divorces, such separations, as those described in the agreed statement of facts, they having been made under, and being sanctioned by, the laws of the Miami tribe of Indians."

Nothing was, or could have been determined in that case, as to the right of the State to tax the lands and other property of the Indians residing on and owning such lands, under treaties with the United States.

It is claimed by the appellees that these Indians have lost their tribal relations by the removal of a portion of their number to Kansas, and that those who remain must be regarded as having become so far intermixed with the whites as to be subject to the same laws.

This is a question, for a solution of which we must look to the action of the government of the United States, and it is primarily a question for the political departments of the government. *United States* v. *Holliday*, 3 Wal. 407. We think it does not follow, because a part of the tribe have emigrated to Kansas, and the other part remained here, that they are, therefore, no longer a tribe. It does not seem necessary that Indians shall reside upon a common territory, or that their lands shall be conterminous, in order to give them the character of a tribe, or entitle them to the rights and immunities thereof. These Indians remained on their ancient possessions, by and with the consent of the authorities of the United States, while those who emigrated were provided with new homes in another part of the country. No change in the relations of those who remain is in any way indicated. They, or some of them, receive their share of the annuities, at or near their old home, as the others do at their new homes. *The Kansas Indians*, 5 Wal. 737. If they have lost their tribal organization, rights, and immunities, when and how did they lose them? It is for counsel who insist that they have ceased to be a distinct people, and become incorporated with us, clothed with all· the rights and bound

to all the duties of citizens, to point out when and how that event took place. Do our laws allow these Indians to participate equally with us in our civil and political privileges? Do they vote at our elections, or are they represented in our legislatures, or have they any concern, as jurors or magistrates, in the administration of justice? Have they ever, in any way, been regarded as members of our body politic? All of these questions must, we think, be answered in the negative. See *Goodell* v. *Jackson*, 20 Johns. 693.

But suppose these Indians have ceased to be part of their original tribe, does it follow that they have no organization which entitles them to be regarded as a separate people? Does not the treaty of 1838 expressly recognize them as having such organized existence? If not, why is this land reserved to them as "the band of Ma-to-sin-ia"? Receiving these treaties as paramount to any law which the State can enact, we must accord to these Indians an organized and separate existence, and must hold that they have not become incorporated into, and do not form a part of the body politic of the State. But in order to place this matter on other ground, we will examine it a little further. It is provided in the ordinance of 1787, art. 3, as one of the irrevocable clauses thereof, that "the utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights, and liberty, they never shall be invaded or disturbed unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall from time to time be made, for preventing wrongs being done to them, and for preserving peace and friendship with them."

To form the compact entered into by the State with the general government, at the time of the admission of the State into the Union, it was provided by the act of Congress of April 19th, 1816, that the people of the State might form a constitution and be admitted into the union, "provided, that the same, whenever formed, shall be republican, and not

repugnant to those articles of the ordinance of the thirteenth of July, one thousand seven hundred and eighty-seven, which are declared to be irrevocable between the original states and the people and states of the territory north-west of the river Ohio." etc.

The territorial legislature assented to this in its ordinance of June 10th, 1816. "That we do, for ourselves and our posterity, agree, determine, declare, and ordain, that we will and do hereby accept the propositions of the Congress of the United States, as made and contained in their act of the ninteenth day of April, eighteen hundred and sixteen, entitled," etc., was the language in which the people of the State of Indiana entered into this irrevocable compact. These are the Indian's *Magna Charta.*

It is now proposed to carry out this agreement by taxing the lands and other property of these Indians. Is this not taking from them their property "without their consent"? Is it thus that " in their property, rights, and liberty, they never shall be invaded or disturbed"? Is this the manner in which "the utmost good faith shall always be observed towards them"?

But we will not extend this opinion by a further examination of the question. We refer, however, to the following cases: *The Kansas Indians,* 5 Wal. *supra; The New York Indians, id.* 761; *Worcester* v. *State of Georgia,* 6 Pet. 515; *The Cherokee Nation* v. *The State of Georgia,* 5 *id.* 1, which we think settle the question against the right to impose the taxes in question.

The judgment is reversed, with costs, and the cause remanded.

*J. VanDevanter* and *J. F. McDowell,* for appellants.

*J. Brownlee, H. Brownlee,* and *B. W. Hanna,* Attorney General, for appellees.