**UNITED STATES ex rel. MARKS v. BROOKS, Justice of Peace, et al.**
**No. 680.**

District Court, N. D. Indiana, South Bend Division.

Feb. 28, 1940.

**CORCORAN v. MONTGOMERY WARD & CO., et al.**
**No. 388–H.**

District Court, S. D. California, Central Division.

March 15, 1940.

Elmer Morris, of Peru, Ind., for plaintiff.

Fred W. Eley, Deputy Atty. Gen., of Indiana, Counsel for Department of Conservation, and Eugene M. Weesner, Pros. Atty., of Wabash, Ind., for defendants.

SLICK, District Judge.

Frank Marks, alias "Ko-A-Chin-Wah", a Miami Indian of the Miamis of Indiana, residing in Wabash County, Indiana, filed a complaint in this court asking an injunction against Benjamin Brooks, Justice of Peace of Noble Township, Wabash County, Indiana, and the Conservation Department of the State of Indiana. Plaintiff alleges that he was unlawfully arrested on process issued out of the court of said Benjamin Brooks on an affidavit made by the State Conservation Department, charging him with the unlawful possession of a pet raccoon, in violation of the Conservation laws of the state of Indiana; that he stood trial for said offense, was found guilty and fined $10 and costs, and that he has reason to believe a commitment has been issued by defendant Brooks for his arrest because the fine has not been paid. Plaintiff brings this action alleging that said Justice of the Peace court does not have jurisdiction over him because he is a Miami Indian, and prays the court to assume jurisdiction of all matters arising in or pertaining to said action in the court of defendant Brooks, and that a restraining order and injunction issue against defendants restraining them from prosecuting said plaintiff.

A temporary restraining order was granted pending a hearing on the merits of the case. The prosecuting attorney of Wabash County and the Attorney General of the State of Indiana entered their appearance. Evidence and argument was heard on the application to make the temporary restraining order permanent.

The state contends that Federal Courts are without power and authority to enjoin proceedings in a state court. This is clearly stated by the provisions of Section 265 of the Judicial Code, Title 28 U.S.C.A. § 379, which provides as follows: "The writ of injunction shall not be granted by any court of the United States to stay proceedings in any court of a State, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy." However, this section is not applicable where the state court was without jurisdiction. Pierce v. National Bank of Commerce in St. Louis, 8 Cir., 282 F. 100. And many cases hold that where the injunctive process of a Federal Court is invoked to protect its own jurisdiction this section has no application.

Therefore, in order to grant the relief asked for, it is necessary for this court to definitely decide that the plaintiff, being a Miami Indian, is subject only to the jurisdiction of the United States court. The court is thus obliged to decide in this injunction action the exact status of the Miami Indians residing in Indiana—are they citizens of the United States and subject to all the laws of the state of Indiana as such citizens, or are they wards of the United States government residing on a reservation? If they are wards of the government and residing on a reservation, as plaintiff alleges, the law is clear that the state of Indiana would have no power to interfere with the Indians through any state regulations. United States v. Thomas, 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276.

In addition to claiming that this court has sole jurisdiction, plaintiff contends that, under the treaties made with his tribe, the members of the tribe are immune from fishing and hunting restrictions laid down by the Conservation Department of the State.

To reach a conclusion in this case, it has been necessary to make a thorough study of the history of the treaties and laws in connection with the Miami Indians. A brief outline of the treaties and laws in question follows:

*History before Indiana was admitted to the Union:*

*Treaty of Greenville, August 3, 1795, II Kappler, 39, 7 Stat. 49.*

Entered into by 14 Confederated Tribes of Indians, composing the Great Miami Nation of the Northwest Territory, and Major General Anthony Wayne, sole Commissioner of the U. S.

The purpose of this treaty was to put an end to war and settle controversies. A boundary line was established between the lands of the United States and lands of 14 tribes of Indians, including the Miamis. Certain lands were ceded by the Indians to the United States, and claims of the United States to other lands were relinquished by the United States to the Indians.

Article V of this treaty reads as follows: "To prevent any misunderstanding about the Indian lands relinquished by the United States in the fourth article, it is now explicitly declared, that the meaning of that relinquishment is this: The Indian tribes who have a right to those lands, are quietly to enjoy them, *hunting,* planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United States."

Article VII of this treaty provides: "The said tribes of Indians, parties to this treaty, shall be at liberty to hunt within the territory and lands which they have now ceded to the United States, without hindrance or molestation, so long as they demean themselves peaceably, and offer no injury to the people of the United States."

*Treaty of Fort Wayne, June 7, 1803. II Kappler 64, 7 Stat. 74.*

*The Treaty of Grouseland, Aug. 21, 1805. II Kappler 80, 7 Stat. 91.*

By these treaties the Miamis made further cessions to the United States of land in Indiana. No reference was made to provisions of Treaty of Greenville and no rights of any kind reserved by Miamis.

*Treaty with the Delawares, etc., Sept. 30, 1809, at Fort Wayne, II Kappler 101, 7 Stat. 113.*

Tribes, including the Miamis, ceded further land and reserved hunting rights as set out in Treaty of Greenville. But property so ceded was not located in Wabash County, the residence of plaintiff.

*Act of Congress, April 19, 1816 (Burns' Ind.Statutes, Vol. 1, Page 302 (1933) 3 Stat. 289.*

Provided that people of the state of Indiana might form a constitution and be admitted into the Union, "provided, that the same, whenever formed, shall be republican, and not repugnant to those articles of the ordinance of the thirteenth of July, one thousand seven hundred and eighty-seven," etc. § 4.

*Ordinance of 1787 (Burns' Ind.Statutes, Vol. I, page 288 at 291 (1933).*

Art. III is as follows: "The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and, in their property, rights, and liberty, they never shall be invaded or disturbed, unless in just and lawful wars authorized by Congress; but laws founded in justice and humanity shall from time to time be made, for preventing wrongs being done to them, and for preserving peace and friendship with them."

By act of convention of state of Indiana, Congressional Enabling Act of 1816 accepted (Burns' Ind. Vol. 1, p. 304), and by resolution of Congress approved Dec. 11, 1816, state of Indiana was declared to be member of Union (Burns' Vol. I, p. 305).

*Treaty of St. Marys, Oct. 6, 1818. II Kappler 171, 7 Stat. 189.*

Miami tribe by this treaty ceded more land to the United States, reserved certain portions, including land where petitioner lives and where offense was committed. No hunting and fishing rights reserved—no mention of Treaty of Greenville.

*Treaty at the mouth of the Mississinewa, Oct. 23, 1826. II Kappler, 278, 7 Stat. 300.*

Miami tribe by this treaty ceded additional land to the United States and several reservations of land were set off to the Miamis. Article VIII of this treaty made the following provision "The Miami tribe shall enjoy the right of hunting upon the land herein conveyed, so long as the same shall be the property of the United States."

*Treaty at the forks of the Wabash, 1834. II Kappler, 425, 7 Stat. 463.*

Further cessations. No reservation of hunting rights.

*Treaty at the forks of the Wabash, 1838. II Kappler, 519, 7 Stat. 569.*

Part of reservations ceded to the U. S., but from this cession the Miami tribe reserved for the band of Ma-to-sin-ia, certain tracts of land. Provisions made for exploration of land west of the Mississippi for use of the tribe when they "may be disposed to emigrate from their present country." Art. 10. The tract reserved for the use of the band of Me-to-sin-ia is now included in Grant and Wabash Counties. No mention of hunting rights.

*Treaty of Nov. 28, 1840 at the Forks of the Wabash. II Kappler, 531, 7 Stat. 582.*

Miami tribe ceded to the U. S. all of their remaining lands in Indiana. Treaty provided for removal of the Indians to land west of the Mississippi. Further provided for conveyance by patent to Me-shing-go-me-sia, son of Ma-to-sin-ia, to be held for his band, of the tract of land reserved by treaty of 1838. Art. 11 provided "Nothing in this treaty shall be so construed as to impair the force or validity of former treaty stipulations existing between the U. S. and the Miami tribe of Indians, not altered by nor coming within the purview of any of the provisions of this treaty."

This treaty when ratified by the Senate, divided the Great Miami Nation into two separate branches and tribes, the Western Miamis, who moved to Kansas, and the Miamis of Indiana, who remained in Indiana. (Plaintiff is a descendant of the band of Me-shin-go-me-sia.)

*Treaty of 1854 at Washington. II Kappler, 641, 10 Stat. 1093.*

Provided for settlement of all annuities and claims to Miami Indians of Indiana (band of Ma-to-sin-ia) and Western Miamis.

*Act of 1871. I Kappler, 8, 25 U.S.C.A. § 71.*

Sec. 2079 provided: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired."

*Act of Congress of June 1, 1872, I Kappler, 133, 17 Stat. 213.*

Provided for partition to be made of the reservation in trust for the band of Me-shin-go-me-sia, the Miami tribe of Indiana, and contained provision that "the United States hereby release to said band all right of purchase of said reservation." Further provided that after partition, lists were to be filed with the Secretary of Interior; he was authorized to cause patents

to issue to the several persons to whom partition was to be made, conveying in fee to each the tract of land so set apart to him, which would entitle the owner thereof to the use, occupancy and control of same. Further provision was made that after partition, lands were to become subject to laws of descent of Indiana, but should never be subject in any time to come, to any debt contracted prior to the date of partition, nor be subject to levy, sale, forfeiture or mortgage prior to Jan. 1, 1881, nor were such lands to be disposed of or sold by the owners prior to Jan. 1, 1881.

This act further provides that the property shall become subject to taxation as other property under the laws of the state of Indiana on and after Jan. 1, 1881, and that the members of the band and their descendants, shall become citizens of the United States on Jan. 1, 1881.

(In accordance with above act, lands of the band of Ma-to-sin-ia were patented to the members thereof in severalty and records of patents dated Dec. 31, 1873 are on file in the offices of the Recorders of Wabash and Grant Counties.)

*Act of March 3, 1881, 21 Stat. 414, 433.*

By this act Congress appropriated $221,-257.86 to pay the Miami Indians of Indiana, the money due them under the 1854 treaty, and the Secretary of Interior was directed to make a census of these Indians and distribute the money per capita.

To maintain his contention that the Miami Indians of Indiana have the right to hunt and fish at will in this state, plaintiff refers to the Treaty of Greenville entered into in 1795 (listed in summary of treaties above), which provided that "The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please", and states that General Anthony Wayne interpreted this provision to mean that they could hunt and fish "as long as the waters flow and the grass grows", and this interpretation has been handed down from one generation to another and is so understood by the Miami Indians today.

Plaintiff makes much of the fact that Indiana was admitted to statehood on the condition that the Ordinance of 1787 be adopted and observed, part of which provides: "The utmost good faith shall always be observed toward the Indians; their lands and property shall never be taken from them without their consent; and, in their property, rights, and liberty, they never shall be invaded or disturbed." Art. 3. This has been called the Indians' Magna Charta. Me-shin-go-me-sia v. State, 36 Ind. 310. Plaintiff alleges that this provision prevents Indiana from legislating against the Indians within its borders.

Defendants contend that the reservation of hunting and fishing rights made in the Treaty of Greenville was not definitely reserved in subsequent treaties, and would therefore not be effective. In fact, much has been said pro and con on the questions in dispute, and up to the point of the Act of Congress of 1872, an interesting question of interpretation of these ancient treaties would arise.

However, after a careful study of the treaties and acts involving the Miamis of Indiana, I am constrained to believe that the Act of 1872, providing for the partition of lands, the conveyance of patents, and the granting of citizenship, definitely severed the relationship of guardian and ward between the United States and the Miamis of Indiana. Up to that point (1872) I would be inclined to agree with plaintiff's counsel that the reservation of hunting and fishing rights adhered to all subsequent treaties, inasmuch as no specific relinquishment was stated in treaties following the Greenville treaty. This would be on the well established rule that Indian treaties are to be interpreted and construed in favor of the Indian, and construed in the sense in which the Indians understood them. Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49; Starr v. Long Jim, 227 U.S. 613, 33 S.Ct. 358, 57 L.Ed. 670; United States v. Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213.

Plaintiff urges that the hunting and fishing easement is further substantiated by the act of Congress of 1871, which provides: " * * * but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March 3, 1871, shall be hereby invalidated or impaired." However, this act was passed in 1871, and up to that time would probably be good authority for holding that right inviolate. But the Act of 1872, which provided for the partition and which was ratified by the members of the tribe of Me-shin-go-me-sia duly carrying out the provisions of that act abrogated all former treaties and acts affecting the Miami Indians of Indiana. The principle that a treaty may supersede a prior act of Congress and an act of Congress supersede a

prior treaty is elementary. Fong Yue Ting v. United States, 149 U.S. 698, 13 S.Ct. 1016, 37 L.Ed. 905; Cherokee Tobacco, 11 Wall. 616, 20 L.Ed. 227.

Some evidence was adduced at the hearing to indicate that the Miami Indians maintain their tribal relationship and have monthly council meetings, but the evidence also showed that members of this Indian band, including plaintiff, have voted in general elections. It would seem to carry some weight that the Department of Interior has disclaimed any further responsibility for this tribe asserting in an opinion directed to the Prosecuting Attorney of Wabash County, that the Acts of 1872 and 1881 are interpreted by their department to dispose of the property of the band and to dissolve tribal relationship in favor of individual citizenship. A decision of the Assistant Attorney General for the Interior Department of Nov. 23, 1897 (25 L.D. 426) concluded that these Indians were no longer under the guardianship of the United States.

■ Title 25 U.S.C.A. § 549 (Act of Congress passed in 1887) provides in part as follows: " * * * when the lands have been conveyed to the Indians by patent in fee * * * then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State * * * in which they may reside." An Indian who has obtained patent in fee to his allotment not only is a citizen of the United States, but has all the rights, privileges and immunities of citizens of the United States and is subject to the civil and criminal laws of the state. He is no longer a ward of the government. State v. Big Sheep, 1926, 75 Mont. 219, 243 P. 1067.

■ The members of the tribe of Me-shin-go-me-sia waived any claim they might have to former treaty rights and privileges by consenting to the partition of the land reserved to their band by the Act of 1840, and by accepting the lands patented to them as individuals. The only rights they now have in such lands are those of a holder in fee simple, and they are now citizens of the United States with the same privileges and restrictions of any other citizen. This court cannot therefore interfere with the process in the state court.

In the case of Sarah A. Pennock v. Commissioners, 103 U.S. 44, 48, 26 L.Ed. 367, the court said: "When the patent of the government is once issued for the lands, all restrictions upon their alienation, not expressly named, are gone." In this case, plaintiff, an Indian woman, having a title to land carrying with it absolute ownership with a right of free disposition at will, was held to be subject to the laws of the state, entitled to its protection and bound to bear a portion of its burdens. Also see Spalding v. Chandler, 160 U.S. 394, at page 407, 16 S.Ct. 360, 40 L.Ed. 469.

Plaintiff relies very strongly on two cases in this state, one decision rendered by the Indiana Supreme Court, Me-shin-go-me-sia v. State, 36 Ind. 310, and the other, Wau-pe-man-qua, alias Mary Strack v. Aldrich, C.C., 28 F. 489. The former case was decided in 1871, and held that under the Ordinance of 1787, land belonging to the Miami Indians was not subject to taxation. However, it must be noted that this decision was rendered before the Act of 1872 was passed, which completely changed the status of the Miami Indians in Indiana. In the latter case, also involving a taxation question, Judge Woods held that the lands patented to Jean Baptiste Richardville, a chief of the Miami Nation, under treaties of 1818 and 1840, in trust for his tribe, were exempt from taxation. Richardville was not a member of the band of Me-shin-go-me-sia, and the particular tract of land patented to Richardville in trust was not mentioned in the Act of 1872.

■ Having decided that this court does not have jurisdiction to grant an injunction, there is no need to inquire into the rights of the state as to the imposition of the conservation laws on the Miami Indians of Indiana, but in passing, the court might state that the law seems clearly defined that it is within the police powers of the state to enforce such regulations on Indians not living on reservations.

In the case of Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 1077, 41 L.Ed. 244, the Indian lived on a reservation created by treaty which took effect in 1869, 15 Stat. 673, which provided: "They shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts." In 1868 an act was passed creating a temporary government for the territory of Wyoming, which provided: "Nothing in this act [chapter] shall be construed to impair the rights of person or property pertaining to

428

the Indians in any Territory, so long as such rights remain unextinguished by treaty between the United States and such Indians." 15 Stat. 178, 48 U.S.C.A. § 1451. Wyoming passed an act regulating the killing of game within the state. Laws Wyo. 1895, c. 98, p. 225. Information was filed against the Indian, Race Horse, for having killed elk off the reservation in violation of the law of the state. He was arrested and a writ of habeas corpus was filed in the Federal Court. In this case, Mr. Justice White said: "The sole question which the case presents is whether the treaty made by the United States with the Bannock Indians gave them the right to exercise the hunting privilege * * * within the limits of the state of Wyoming, in violation of its laws. * * * The power of a state to control and regulate the taking of game cannot be questioned. Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600 [40 L.Ed. 793]. * * * 'the states have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience, and prosperity of their people.' * * * Escanaba & L. M. Transp. Co. v. Chicago (1882) 107 U.S. 678 [and 683], 2 S.Ct. 185 [27 L.Ed. 442]." The court in this case definitely held that a state cannot be stripped by implication and deduction of an essential attribute of its governmental existence.

In a more recent case, People of State of New York ex rel. Kennedy v. Becker, as Sheriff of Erie County, 241 U.S. 556, 36 S.Ct. 705, 707, 60 L.Ed. 1166, three Seneca Indians were arrested for spearing fish at a place outside the reservation in violation of the State Conservation Acts. The place the offense took place was within the territory ceded by the Seneca Nation to Robert Morris by the Big Tree Treaty of 1797, 7 Stat. 601, which treaty contained the provision that the Indians would be permitted to fish on the land so ceded. These lands thereafter passed by conveyance into private ownership. The court, in holding that the state could enforce conservation laws against Indians for offenses committed off the reservation, said: "It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing, to which the legislation in question was addressed."

In this connection, see, also, United States et al. v. Alaska Packers' Ass'n, C.C., 79 F. 152, and Manchester v. Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159.

The temporary restraining order heretofore entered is dissolved, and the complaint is dismissed for lack of jurisdiction.