**The AIR LIFT COMPANY, Inc., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 5125.**

United States District Court W. D. Michigan, S. D.

June 28, 1968.

Howrey, Simon, Baker & Murchison, Washington, D. C., John Bodner, Jr., Washington, D. C., of counsel, Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., Stephen C. Bransdorfer, Grand Rapids, Mich., of counsel, for plaintiff.

Harold D. Beaton, U. S. Atty., Grand Rapids, Mich., Donald R. Anderson, Department of Justice, Washington, D. C., for defendant.

## OPINION

FOX, District Judge.

This case arises under § 4061(b) of the Internal Revenue Code of 1954 which imposes an excise tax of 8% on certain automobile parts and accessories sold by the manufacturer, producer and importer. Plaintiff by its complaint seeks a refund of the tax paid by it under that section for the period October 1, 1964 through December 31, 1964. The grounds of this request for a refund are that the tax was collected illegally since Air Lift was not the manufacturer of the goods in question.

By its counterclaim the government seeks to collect back taxes not paid by Air Lift for the period July 1, 1960 through September 30, 1964. This court has jurisdiction of the subject matter of the case pursuant to 28 U.S.C. § 1346(a).

The Air Lift Company is a Michigan corporation with a net worth of less than $500,000 and employing 12–16 persons during the period in question. It packages and sells a line of equipment which (among other, nonautomotive uses) is designed to be used on motor vehicles as a spring booster device to increase carrying capacity, improve the ride and level the vehicle. This product is an automobile accessory within the meaning of § 4061(b) of the Internal Revenue Code of 1954, 26 U.S.C. § 4061(b).

Air Lift sells three basic series of this product, but only the A and C series are in question here. The B series is a more sophisticated product; and Air Lift, by virtue of certain combining and assembling functions which it performs on that series, has continually paid the manufacturer's excise tax thereon.

The A and C series, however, consist only of two inflatable rubber cylinders (which are designed to fit inside the coil spring of a motor vehicle), two or four small circular hard rubber washer protective devices (to prevent the spring attachment nut from tearing the cylinder), printed instructions and a warranty. Air Lift receives these rubber devices, both cylinders and protectors, in a fully completed, fabricated form, ready for installation into an automobile. The devices are shipped in multiples of complete sets in a large box containing from 6–10 sets. The only function which Air Lift performs on these devices is to transfer them from a large box to individual boxes, with Air Lift's label thereon, and to include instructions and a warranty with each set. The box is then sealed and shipped out.

During the years 1960 through early 1963 Air Lift purchased these cylinders and protectors, first, from the Armstrong Rubber Company, West Haven, Connecticut, and thereafter until the present time purchased the devices from the Cupples Rubber Company of St. Louis, Missouri. Armstrong is a major rubber manufacturer with sales in excess of $100,000,000 a year during the time in question, and employing nearly 6,000 persons. Cupples is somewhat smaller, but still employs 450 people in its rubber division. The contractual relations between these companies and Air Lift, and the production techniques used by both companies are essentially the same. These fabricators had complete control of the production process. With the exception of the molds (whose value was less than 1% of the total value of the machinery necessary to manufacture the cylinders), all the machinery was owned by the fabricators. All the labor and material were provided by the fabricator.

The sales agreements were arms-length transactions and the manufacturers took all the risks of production. The fabricators were aware that the product was intended to be used on automobiles, and they paid the 8% manufacturer's excise tax. Although Air Lift holds a patent on the use of this invention as a spring suspension device, the manufacturer could have produced and sold these cylinders for other uses such as in the manufacture of electric motors, for diving board spring devices, in vending machines, as boat and dock bumpers, and for use by plumbers. Air Lift sold a number of the sets for such uses to general Electric, United States Electric Motors Corporation, and other corporations.

Air Lift in determining the price it charged for the sets as they were shipped out did not include an amount which would have covered the 8% manufacturer's excise tax. This fact is established not only by the testimony of Mr. Robert C. Pemberton, President of Air Lift, who determined or helped to determine pricing policy, but also by the fact that Air Lift was aware that its supplier, Armstrong or Cupples, was paying the tax. There was also testimony by Mr. Leon A. Ellis, the firm's accountant, that he saw no indication that Air Lift was collecting the tax on the A and C sets, while it was clear from the pricing information with which he worked regularly that the tax was being collected for the B sets.

The major issue in this case, stated simply, is whether Air Lift is the manufacturer of these A and C sets within the meaning of § 4061(b), Internal Revenue Code of 1954, 26 U.S.C. § 4061(b). Defendant relies on such cases as Polaroid Corporation v. United States, 235 F.2d 276 (1st Cir., 1956), cert. den. 352 U.S. 953, 77 S.Ct. 325, 1 L.Ed.2d 244, and Charles Peckat Mfg. Co. v. Jarecki, 196 F.2d 849 (7th Cir., 1952), cert. den. 344 U.S. 875, 73 S.Ct. 169, 97 L.Ed. 678. Defendant asks this court to interpret those decisions as establishing that

whenever a patentee or licensee under a patent sells the patented article under the facts in this case, he shall be deemed the manufacturer for the purposes of the manufacturer's excise tax.

In the Polaroid case, Polaroid contracted with Greist Mfg. Co. to produce cameras for which Polaroid held certain patents. Greist did all the fabricating of the cameras and affixed the Polaroid trademark to them. The contract contained an escalator clause which provided for changes in the unit price of the camera to reflect changes in Greist's manufacturing costs due to fluctuation in labor and material costs. Polaroid agreed to buy Greist's entire output, and it dictated the amount of that output. If Greist made extra cameras it could not sell them elsewhere. All risks of changes in cost fell on Polaroid. Polaroid owned or agreed to buy all specialized tools used in the manufacturing process. Polaroid could terminate the agreement without cause and Greist could never make another camera. In short, Polaroid completely dominated the manufacturing process. 235 F.2d at 277–278.

The Court of Appeals for the First Circuit agreed with the trial judge that Polaroid was the manufacturer for purposes of the excise tax. (§ 3406(a) (4) of the Internal Revenue Code of 1939, 26 U.S.C. § 3406(a) (4). The court held that because Polaroid so controlled the entire process and because Greist had no right to sell the product, but could only deliver it to Polaroid, this was not a "sale" within the meaning of the statute. Since only the "first" sale was meant to be taxed by the statute (Indian Motorcycle Co. v. United States, 283 U. S. 570, 574, 51 S.Ct. 601, 75 L.Ed. 1277 (1931) ), the tax did not attach until the cameras were sold by Polaroid. The court concluded its decision as follows:

> We believe that a "sale" which conveys no right to use or resell the product, but only a bare right to possession, is not a sale within the meaning of § 3406(a) (4), 235 F.2d at 278.

The case before this court has some similarity to the Polaroid case, but the differences are substantial. Not only do Armstrong and Cupples, according to uncontested testimony at trial, completely control the manufacturing process, their sales to Air Lift are bona fide, arms-length transactions. They are free to sell the rubber cylinders to other buyers subject only to the limitation that they may not advertise or encourage their use as spring suspension devices or otherwise contribute to the infringement of Air Lift's patent. If Cupples or Armstrong have excess cylinders they may dispose of them to buyers for the many other uses which the devices have.

The second case which defendant cites for its contention is Charles Peckat Mfg. Co. v. Jarecki, supra. In that case the court held that where the holder of a patent for automobile sun visors had that product fabricated, packed and shipped by another firm in the name of the taxpayer, that taxpayer was the manufacturer within the meaning of 26 U.S.C. § 3403(c), the forerunner of the present § 4061(b). That case is also distinguishable from this case in that Peckat, like Polaroid, had a large measure of control over the manufacturing process and bore many of the risks of production. The supplier in that case, Davis Stamping Co., could not have sold the items without the approval of Peckat.

Taxpayer in that case owned all the specialized tools and dies used in the stamping process. Davis did not consider itself the manufacturer or pay the excise tax on the accessories. There were provisions in that contract for adjusting the unit charge to Peckat based on production costs. No such provision exists in the relationship in this case.

The taxpayer in that case had to bear the responsibility for unused raw materials. In this case, raw materials are the responsibility of the fabricator and are obtained from its ordinary source of supply. There is no contention in this case that Air Lift holds title to the de-

vices while in the fabricating process. Title passes to Air Lift for the first time when it receives the bags and protectors from its supplier in multiples of complete sets. The fabricator has by that time designated the sets as automobile accessories and has accepted responsibility for payment of the tax. This transaction is the first sale. It is a bona fide sale from the manufacturer to a distributor and it is just such a sale that the tax was designed to reach.

■ A manufacturer who buys raw materials, who carries the risk of the purchase of raw materials, who fabricates them according to specifications into a finished product with no further requirement of processing or fabrication, has a proprietary interest in that product. When he transfers his proprietary interest to another, be he patentee or otherwise, that is a sale, an arms-length transaction. That is the point at which the tax becomes effective. If we do not say that that is the point where the tax becomes effective, then we must say, ipso facto, that a patentee is always the manufacturer. I do not read that in the Internal Revenue Code.[1]

■ The object of the law is to reach the first sale. If Congress had intended to include first sales by patentees or licensees, it could easily have said so. While it is impossible for Congress to include all conceivable situations within the language of a statute, it is clear from the language of the statute and from the regulations of the Treasury Department that no special meaning is intended by the term "manufacturer." In Earl Glass Co. v. United States, 197 F.Supp. 707, 708 (D.Nev., 1961)[2] the court found it necessary to construe the same statute we have before us now. That court stated:

> There is no reason to suppose that the term "manufacture" was used in the instant statute in anything other than its ordinary and generally accepted manner. Reinecke v. Smith, 1933, 289 U.S. 172, 175, 53 S.Ct. 570, 77 L.Ed. 1109; Old Colony Railroad Co. v. Commissioner of Internal Revenue, 1932, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484; United States v.

1. The court is aware of the emphasis placed on the patent in the Polaroid case. That court stated, quoting from the trial court:

"The patents seem to me of particular significance. If Greist were the ordinary uncontrolled manufacturer it would have to pay royalties to Polaroid, which, in turn, would be reflected in the sales price upon which the tax would be computed. Plaintiff's counsel made it plain in his opening that it was his contention, and would be Greist's, for whose tax if any, the contract made Polaroid responsible, that the tax should be Greist's on the basis of Greist's cash price to Polaroid. This disregards the fact that Polaroid was supplying a necessary and valuable component of any sale, a license under the patents. This absence of royalties is an abnormal situation. I think Polaroid is trying to eat its cake and have it." 235 F.2d at 278.

Here the patent was not a necessary component of the sale to which we have said the tax attaches. Only by saying that an article is not "manufactured" until the value of the patent has been included in its unit price can we say that Air Lift is the statutory manufacturer. We do not think that the Polaroid court went that far, because after describing the degree of control which Polariod held over Greist (a feature which is absent from this case:) the court again quoted the trial judge in saying:

"* * * Obviously there is bound to be a difficult border line as to when, in the concept of this act, one is a manufacturer or only a buyer. The case at bar may be close. It is my opinion, however, that the balance favors the government. * * *" 235 F.2d at 278.

If Polaroid was a close case, in this case the balance goes the other way.

2. This was an action by a taxpayer to recover excise taxes erroneously assessed. There the taxpayer bought automobile glass from the manufacturer, cut and ground it to size and delivered it to customers for use in automobiles. The district court held that this was not manufacturing within the meaning of § 4061(b).

First National Bank, 1914, 234 U.S. 245, 258, 34 S.Ct. 846, 58 L.Ed. 1298. Under these circumstances, it would be appropriate to note some of the observations of the Supreme Court on the occasions when it has had to construe the term "manufacture."

In Hartranft v. Wiegmann, 1887, 121 U.S. 609, 614, 7 S.Ct. 1240, 1243, 30 L.Ed. 1012, the Court held that "the application of labor to an article, either by hand or by mechanism, does not make the article necessarily a manufactured article" within the meaning of the tariff statutes. In Anheuser-Busch Brewing Co. v. United States, 1908, 207 U.S. 556, 562, 28 S.Ct. 204, 206, 52 L.Ed. 336, the Court pointed out that "manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary, * * *. There must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" The statute involved in Anheuser-Busch was a tariff statute, but the logic of the Supreme Court is highly persuasive under the facts and statute involved herein. See also East Texas Motor Freight Lines, Inc. v. Frozen Food Express, 1956, 351 U.S. 49, 52–54, 76 S.Ct. 574, 576, 100 L.Ed. 917, where the Court observed that "killing, dressing, and freezing a chicken is certainly a change in the commodity," but, then, after citing and quoting from Anheuser-Busch, supra, tersely commented that a "chicken that has been killed and dressed is still a chicken," and not a manufactured commodity. 197 F.Supp. at 708.

Unless there is something in the statute itself to indicate that "manufacturer" means something other than what the term ordinarily implies, we must be bound by the term as it ordinarily is applied. To attach to it an esoteric meaning within the technical field of taxation might invade the province of Congress.

In doing so, a court would then be legislating.

This problem, even in cases involving patents is not new. Congress and the Internal Revenue Service have had ample opportunity to clarify the confusion in the area. Therefore, I cannot read into the statute that patentees, per se, because of the exclusivity of the patent, are manufacturers, or that a licensee of a patentee is, per se, a manufacturer.

A plaintiff suing for a refund of excise tax payments illegally or erroneously assessed and collected must establish that he "has not included the tax in the price of the article * * * with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article." 26 U.S.C. § 6416(a) (1) (A). This requirement is imposed to insure that a taxpayer has not been unjustly enriched by passing the tax on to his customers and then receiving a refund from the government.

The cases have held that "very clear and decisive evidence" is required to establish that the tax was not passed on. Andrew Jergens Co. v. Conner, 125 F.2d 686, 689 (6th Cir., 1942). Such evidence has been received in this case. Not only has the president of the corporation testified that the tax was not passed on, but there was evidence that Air Lift knew that its suppliers were collecting and paying the tax. The testimony of the certified public accountant who handled the books for Air Lift indicated that while the tax was clearly included in the price of the B sets, it was not included in the price of the A or C sets. This is enough to satisfy the court "that the money when refunded will go to the one who has borne the burden of the illegal tax, and therefore is entitled in justice and good conscience to such relief." United States v. Jefferson Electric Mfg. Company, 291 U.S. 386, 402, 54 S.Ct. 443, 449, 78 L.Ed. 859, 871 (1934).

The finding that Air Lift is not the manufacturer in this case makes it un-

necessary to decide the issues of whether Air Lift received a ruling that it was not the manufacturer, whether the defendant denied the plaintiff appropriate administrative hearings, and whether plaintiff's attorney was in fact specifically authorized by the plaintiff to execute waivers extending the running of the statute of limitations.

Therefore, it is ordered and adjudged that plaintiff shall have judgment against the defendant in the principal sum of $1,244.23, together with interest as provided by 28 U.S.C. § 2411, and that defendant shall recover nothing by its counterclaim.